# United States Court of Appeals for the Federal Circuit

---

ECOFACTOR, INC.,

*Plaintiff-Appellant,*

v.

GOOGLE LLC,

*Defendant-Cross-Appellant.*

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 6:20-cv-00075-ADA
Hon. Alan D Albright

---

## CORRECTED NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF OF DEFENDANT-CROSS-APPELLANT GOOGLE LLC

---

ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN E. HUCEK
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
E-mail: rvannest@keker.com

Counsel for Defendant-Cross-Appellant GOOGLE LLC

March 31, 2023

# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 8,412,488 (Representative)

1. A system for monitoring the operational status of an HVAC system comprising:

>at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

>one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

>wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said First structure in response to outside temperature, and

>wherein said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

# U.S. Patent No. 8,738,327

1. A system for controlling the operational status of an HVAC system comprising:

> at least one thermostat associated with a structure that receives temperature measurements from inside the structure, the structure conditioned by at least one HVAC system, the thermostat having at least a first setting stored therein;

> one or more servers located remotely from the structure, the one or more servers configured to receive measurements of outside temperatures from at least one source other than the HVAC system,

> the one or more servers are further configured to communicate with the thermostat via a network, wherein the one or more servers receive inside temperatures from the thermostat and compares the inside temperatures of the structure and the outside temperatures over time to derive an estimation for the rate of change in inside temperature of the structure in response to outside temperature,

> the one or more servers are further configured to receive a demand reduction request and determine whether the structure is associated with demand rejection request, and

> based on the determination that the structure is associated with the demand reduction request, the one or more servers are further configured to send a signal to the thermostat to change the setting to a second setting to reduce electricity demand by the HVAC system.

5. The system as in claim **1** in which the estimation is a prediction about the future rate of change in temperature inside the structure.

1. A system for controlling an HVAC system at a user's building, the system comprising:

a memory; and

one or more processors with circuitry and code designed to execute instructions;

the one or more processors with circuitry and code designed to execute instructions to receive a first data from at least one sensor, wherein the first data from the at least one sensor includes a measurement of at least one characteristic of the building;

the one or more processors with circuitry and code designed to execute instructions to receive a second data from a network connection, wherein the second data from the network connection is collected from a source external to the building, wherein the second data from the network connection is received via the Internet;

the one or more processors with circuitry and code designed to execute instructions to receive a first temperature setpoint for the building corresponding to a desired temperature setting when the building is occupied, and a second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied;

the one or more processors with circuitry and code designed to execute instructions to receive commands through the Internet by way of a remote interface on a mobile, wireless device running software application code; wherein the interface is configured to allow the user to adjust temperature setpoints for the HVAC system;

the one or more processors with circuitry and code designed to execute instructions to send user-specific data through the Internet, wherein the user-specific information about the building and HVAC system is generated based at least in part on the user-specific data, wherein the user-specific information is configured to be presented on a user interface on a mobile, wireless device running software application code via the Internet;

the one or more processors with circuitry and code designed to execute instructions to determine whether the building is occupied or unoccupied, and based on that determination, to control the HVAC system to provide heating or cooling to the building at an operational temperature;

wherein the one or more processors comprises a first processor with circuitry and code designed to execute instructions, which is located remotely from the memory and is not electrically connected to the memory;

the first processor with circuitry and code designed to execute instructions to communicate with the memory;

wherein the memory is configured to store historical values of the first data and second data.

2. The system of claim **1**, wherein the operational temperature is the second temperature setpoint for the building corresponding to a desired temperature setting when the building is unoccupied, in the event the one or more processors with circuitry and code designed to execute instructions determines that the building is unoccupied.

12. The system of claim **1**, wherein the determination of whether the building is occupied or unoccupied by is performed by the first processor.

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Defendant-Cross-Appellant Google LLC certifies the following:

1.     Full name of Party Represented by me:

   Google LLC

2.     Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me:

   None

3.     Parent corporations and publicly held companies that own 10% or more stock in the party:

   XXVI Holdings Inc. and Alphabet Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case):

   Keker, Van Nest & Peters LLP:
   - Eric B. Hanson
   - Jennifer A. Huber (now with the San Francisco City Attorney's Office)

- Matthias Andreas Kamber (now with Paul Hastings LLP)
- Patrick E. Murray (now with Gibson, Dunn & Crutcher LLP)
- Anna Porto
- Gregory D. Washington (now with Jenner & Block LLP)

Potter Minton PC:
- Michael E. Jones
- Shaun William Hassett

Allen & Overy LLP:
- Shamita D. Etienne-Cummings
- James P. Gagen
- Eric Lancaster
- James Reed
- Bijal V. Vakil

White & Case LLP:
- Henry Yee-Der Huang
- Michael J. Songer

5.   The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- *EcoFactor, Inc. v. Google LLC*, 22-1971 (Fed. Cir. June 24, 2022)

- *EcoFactor, Inc. v. Amazon.com, Inc.*, 6:22-cv-00068 (W.D. Tex. Jan. 18, 2022)

- *EcoFactor, Inc. v. Resideo Technologies, Inc.*, 6:22-cv-00069 (W.D. Tex. Jan. 18, 2022)

- *EcoFactor, Inc. v. Pointcentral, LLC et al.*, 6:22-cv-00055 (D. Or. Jan. 10, 2022)

- In re *Ex Parte* Reexamination of U.S. Patent No. 8,412,488, 90/014,916 (U.S. PTO Dec. 3, 2021)

- In re *Ex Parte* Reexamination of U.S. Patent No. 8,738,327, 90/014,915 (U.S. PTO Dec. 3, 2021)

- *ecobee, Inc. v. EcoFactor, Inc.*, IPR2021-01052 (PTAB Jun. 10, 2021)

- *EcoFactor, Inc. v. Vivint, Inc.*, 6:20-cv-00080 (W.D. Tex. Jan. 31, 2020)

- *EcoFactor, Inc. v. ecobee, Inc.*, 6:20-cv-00078 (W.D. Tex. Jan. 31, 2020)

6.    Organizational Victims and Bankruptcy Cases.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None

Date:  March 31, 2023          */s/Robert A. Van Nest*
                              Robert A. Van Nest

# TABLE OF CONTENTS

CLAIM LANGUAGE AT ISSUE.................................................... i

CERTIFICATE OF INTEREST ..............................................v

TABLE OF AUTHORITIES...................................................xi

STATEMENT OF RELATED CASES ...................................1

JURISDICTIONAL STATEMENT ......................................1

STATEMENT OF THE ISSUES...........................................2

INTRODUCTION.................................................................4

STATEMENT OF THE CASE ..............................................8

I.     Asserted Patents ......................................................8

       A.     '488 and '327 patents ......................................8

       B.     '382 patent.....................................................11

II.    Accused Products .....................................................12

III.   District Court Proceedings......................................14

       A.     Pretrial proceedings......................................14

       B.     Trial................................................................16

SUMMARY OF ARGUMENT..............................................25

STANDARD OF REVIEW ..................................................28

ARGUMENT ......................................................................30

I.     The district court erred in denying Google's motion for a
       new trial on damages. .............................................30

A. Mr. Kennedy's damages model was speculative and conclusory. ........................................................31

B. Nothing in EcoFactor's proffered settlement agreements attributed the alleged per-unit royalty to the value of the '327 patent. .........................................34

II. The district court erred in denying JMOL of non-infringement because the jury's finding of infringement of the '327 patent was not supported by substantial evidence. ....................................................................40

A. The evidence showed the accused thermostats derive estimates rather than receive measurements of inside temperature and thus do not literally infringe the '327 patent.......................................41

B. No substantial evidence supports infringement of the '327 patent under the doctrine of equivalents. ...........48

III. The asserted claims of the '488, '327, and '382 patents are patent-ineligible.................................................50

A. This Court should review the district court's denial of summary judgment *de novo* because no factual disputes prevented resolution of patent eligibility as a matter of law............................................51

B. The '488 patent claims the abstract idea of comparing the measured inside temperature with a derived estimation to determine whether an HVAC system is on or off............................................52

C. The '327 patent claims the abstract idea of automating the changing of thermostat settings in response to energy-reduction requests. ...........................59

D. The '382 patent claims the abstract idea of automating the changing of thermostat settings based on building occupancy.............................61

E. No disputed facts preclude concluding as a matter of law that the asserted claims of the '488, '327, and '382 patents lack an inventive concept.......................64

IV. The district court correctly granted JMOL of no willfulness and no inducement. ...................................69

V. The district court correctly declined to grant EcoFactor a new trial on the '382 patent.......................................73

A. The district court's handling of source code was proper. ................................................................74

B. The district court's jury instructions were legally sound. ................................................................74

C. EcoFactor failed to preserve its objection to the district court's proper treatment of source code as a demonstrative...................................................78

D. Substantial evidence supports the jury's non-infringement verdict for the '382 patent. .........................80

VI. The district court correctly found the '488 patent claims to be indefinite..............................................82

CONCLUSION ....................................................87

CERTIFICATE OF COMPLIANCE....................................89

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 4, 15-20, 25, 30-33 and 36-37 and consists of a numerical royalty rate ("NRR") that EcoFactor advanced in confidential settlement agreements with third-party licensees, which was presented during sealed fact and expert testimony at trial. The material omitted on page 20 consists of the amount of alleged past damages that EcoFactor sought based on the above numerical royalty rate, which was presented during sealed expert testimony. The material omitted on page 21 appears in an excerpt from Google's confidential source code, which was presented during sealed fact and expert testimony.

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.,*
    890 F.3d 1354 (Fed. Cir. 2018) ........................................... 51

*Advanced Display Sys., Inc. v. Kent State Univ.,*
    212 F.3d 1272 (Fed. Cir. 2000) ........................................... 76

*Alice Corp. v. CLS Bank Int'l,*
    573 U.S. 208 (2014) ................................................... *passim*

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC,*
    967 F.3d 1285 (Fed. Cir. 2020) ........................................... 58

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................... 68

*Apple Inc. v. Ameranth, Inc.,*
    842 F.3d 1229 (Fed. Cir. 2016) ........................................... 56

*Apple Inc. v. Wi-LAN Inc.,*
    25 F.4th 960 (Fed. Cir. 2022) ................................. 38, 39, 40

*Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
    448 F.3d 1324 (Fed. Cir. 2006) ........................................... 41

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.,*
    28 F.4th 1247 (Fed. Cir. 2022) ................................. 69, 70, 71

*Bayer Healthcare LLC v. Baxalta Inc.,*
    989 F.3d 964 (Fed. Cir. 2021) ........................................... 69

*Berkheimer v. HP Inc.,*
    881 F.3d 1360 (Fed. Cir. 2018) ........................................... 51

# TABLE OF AUTHORITIES

*Biodex Corp. v. Loredan Biomedical Inc.*,
    946 F.2d 850 (Fed. Cir. 1991) ............................................................ 29

*BSG Tech, LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) .......................................................... 64

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) .......................................................... 65

*CareDx, Inc. v. Natera, Inc.*,
    40 F.4th 1371 (Fed. Cir. 2022) ........................................................... 52

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
    935 F.3d 1341 (Fed. Cir. 2019) .................................................... 61, 62

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019) ..................................................... 60, 61

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
    681 F. App'x 950 (Fed. Cir. 2017) ............................................... 54, 63

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
    668 F.3d 1340 (Fed. Cir. 2012) .......................................................... 29

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
    15 F.4th 1091 (Fed. Cir. 2021) ........................................................... 52

*Customedia Techs., LLC v. Dish Network Corp.*,
    951 F.3d 1359 (Fed. Cir. 2020) .................................................... 50, 56

*Diamond Coating Techs., LLC v. Hyundai Motor Am.*,
    2014 WL 5698445 (C.D. Cal. Aug. 25, 2014) .............................. 84, 86

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ...................................................................... 57, 58

*Dresser-Rand Co. v. Virtual Automation Inc.*,
    361 F.3d 831 (5th Cir. 2004) .................................................. 80, 81, 82

# TABLE OF AUTHORITIES

**Page(s)**

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
849 F.2d 1430 (Fed. Cir. 1988) ............................................................ 86

*Elec. Power Grp. v. Alstom S.A.,*
830 F.3d 1350 (Fed. Cir. 2016) ................................................... 56, 57

*Enfish, LLC v. Microsoft Corp.,*
822 F.3d 1327 (Fed. Cir. 2016) ................................................... 61, 62

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.,*
879 F.3d 1332 (Fed. Cir. 2018) ............................................................ 34

*Free Stream Media Corp. v. Alphonso Inc.,*
996 F.3d 1355 (Fed. Cir. 2021) ........................................................... 56

*Function Media, L.L.C. v. Google, Inc.,*
708 F.3d 1310 (Fed. Cir. 2013) ................................................... 47, 79

*Hardy v. Chemetron Corp.,*
870 F.2d 1007 (5th Cir. 1989) ............................................................ 29

*Hartsell v. Dr. Pepper Bottling Co. of Tex.,*
207 F.3d 269 (5th Cir. 2000) .............................................................. 76

*HTC Corp. v. Telefonaktiebolaget LM Ericsson,*
12 F.4th 476 (5th Cir. 2021) .............................................................. 78

*i4i Ltd. Partnership v. Microsoft Corp.,*
598 F.3d 831 (Fed. Cir. 2010) ............................................................ 75

*Intell. Ventures I LLC v. Capital One Bank (USA),*
792 F.3d 1363 (Fed. Cir. 2015) ........................................................... 65

*Jimenez v. Wood County, Tex.,*
660 F.3d 841 (5th Cir.2011) (en banc) .............................................. 76

*Johnson v. Ford Motor Co.,*
988 F.2d 573 (5th Cir. 1993) .............................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

*Jon-T Chems., Inc. v. Freeport Chem. Co.,*
704 F.2d 1412 (5th Cir. 1983) (per curiam)......................................74

*K-2 Corp. v. Salomon S.A.,*
191 F.3d 1356 (Fed. Cir. 1999) ...........................................................84

*MLC Intell. Prop., LLC v. Micron Tech., Inc.,*
10 F.4th 1358 (Fed. Cir. 2021)....................................................33, 34

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
572 U.S. 898 (2014)......................................................................28, 83

*Network-1 Techs., Inc. v. Hewlett-Packard Co.,*
981 F.3d 1015 (Fed. Cir. 2020) ...........................................................47

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
521 F.3d 1351 (Fed. Cir. 2008) ...........................................................47

*Omega Pats., LLC v. CalAmp Corp.,*
13 F.4th 1361 (Fed. Cir. 2021).....................................34, 35, 36, 37

*Parker v. Flook,*
437 U.S. 584 (1978)......................................................................54, 58

*Pavo Solutions LLC v. Kingston Technology Company, Inc.,*
2019 WL 8138163 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35
F.4th 1367 (Fed. Cir. 2022)........................................................32, 33

*RecogniCorp, LLC v. Nintendo Co.,*
855 F.3d 1322 (Fed. Cir. 2017) ...........................................................64

*Risher v. Aldrige,*
889 F.2d 592 (5th Cir. 1989)...............................................................79

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC,*
30 F.4th 1109 (Fed. Cir. 2022).............................................................72

# TABLE OF AUTHORITIES

*SAP Am., Inc. v. InvestPic, LLC,*
  898 F.3d 1161 (Fed. Cir. 2018) ........................................... 56

*Seidman v. Am. Airlines, Inc.,*
  923 F.2d 1134 (5th Cir. 1991) ............................................. 29

*Simio, LLC v. FlexSim Software Prods., Inc.,*
  983 F.3d 1353 (Fed. Cir. 2020) ..................................... 64, 66

*SRI Int'l, Inc. v. Cisco Sys., Inc.,*
  14 F.4th 1323 (Fed. Cir. 2021) ........................................... 71

*Synchronoss Techs., Inc. v. Dropbox, Inc.,*
  987 F.3d 1358 (Fed. Cir. 2021) ........................................... 83

*TecSec, Inc. v. Adobe Inc.,*
  978 F.3d 1278 (Fed. Cir. 2020) ........................................... 73

*Trading Techs. Int'l, Inc. v. IBG LLC,*
  921 F.3d 1084 (Fed. Cir. 2019) ........................................... 66

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC,*
  874 F.3d 1329 (Fed. Cir. 2017) ..................................... 63, 66

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.,*
  957 F.3d 1303 (Fed. Cir. 2020) ........................................... 56

*United States v. Brownlee,*
  744 F.3d 479 (7th Cir. 2014) ............................................. 45

*United States v. Garcia,*
  334 F. App'x 609 (5th Cir. 2009) ....................................... 74

*United States v. Lewis,*
  796 F.3d 543 (5th Cir. 2015) ............................................. 78

*United States v. Taylor,*
  210 F.3d 311 (5th Cir. 2000) ............................................. 75

# TABLE OF AUTHORITIES

**Page(s)**

*VirnetX, Inc. v. Cisco Sys., Inc.,*
767 F.3d 1308 (Fed. Cir. 2014) ........................................................... 35

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.,*
609 F.3d 1308 (Fed. Cir. 2010) ............................................... 28, 32, 33

**Federal Statutes**

35 U.S.C. § 101 ............................................................... *passim*

**Rules**

Fed. R. Civ. P. 51(c) ..................................................................... 76

Fed. R. Civ. P. 59(a)(1) ................................................................ 29

Fed. R. Evid. 103(a) .................................................................... 78

Fed. R. Evid. 611 ....................................................................... 74

## STATEMENT OF RELATED CASES

No appeal in or from the district court below was previously taken. Cross-Appellant Google LLC ("Google") agrees the cases in EcoFactor's statement of related cases in its Corrected Principal Brief are related and adds the following cases involving one or more patents-in-suit:

In re *Ex Parte* Reexamination of U.S. Patent No. 8,412,488, 90/014,916 (U.S. PTO Dec. 3, 2021);

In re *Ex Parte* Reexamination of U.S. Patent No. 8,738,327, 90/014,915 (U.S. PTO Dec. 3, 2021); and

*ecobee, Inc. v. EcoFactor, Inc.*, IPR2021-01052 (PTAB Jun. 10, 2021).

Google is unaware of any other pending case that will directly affect or be directly affected by this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and entered final judgment. *See* Appx1-2. Google timely appealed. Appx2280-2281. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

# STATEMENT OF THE ISSUES

1. Whether the district court erred in admitting a damages expert's opinion that relied on an unsupported per-unit royalty rate and failed to separate the value of allegedly infringing features from other features.

2. Whether the infringement judgment on claim 5 of the '327 patent should be reversed because the jury lacked substantial evidence to support its verdict.

3. Whether the district court erred in denying summary judgment of patent ineligibility under Section 101, where the asserted claims recite abstract ideas using generic components arranged in a conventional way.

4. Whether the district court correctly granted Google's JMOL of no willfulness and no inducement because EcoFactor failed to present sufficient evidence to support either claim.

5. Whether the district court properly exercised its inherent trial management authority in treating source code as a demonstrative, and whether EcoFactor failed to preserve its objection to the same.

6. Whether the district court correctly found the '488 patent

claims indefinite because of their fatally uncertain scope, as confirmed

by EcoFactor's own technical experts.

## INTRODUCTION[1]

This cross-appeal by Google stems from several significant errors below. First, the court erroneously permitted EcoFactor's damages expert, Mr. Kennedy, to rely on EcoFactor's unilateral representations regarding "what EcoFactor believes is a reasonable royalty calculation of ██NRR██ per-unit" in "whereas" clauses that EcoFactor's counsel added to lump-sum settlements executed during this litigation. But EcoFactor and Mr. Kennedy admitted that they had ***no*** sales volume information to substantiate such a per-unit royalty. Mr. Kennedy also flouted the requirement that the settlements he relied upon—each involving 30+ patents—be comparable to a license emerging from a hypothetical negotiation for the patents-in-suit. Rather than disaggregate the value of the patents-in-suit from the rest of EcoFactor's portfolio, he simply opined that the per-unit royalty rate would apply to even a hypothetical license covering only one patent.[2] His opinion thus should never have

---

[1] Throughout this brief, "Appx" refers to the Joint Appendix, "Op. Br." refers to the Confidential Principal Brief of Plaintiff-Appellant EcoFactor, Inc. [Corrected]. Unless otherwise noted, all internal quotation marks, alterations, and citations have been omitted, and all emphases have been added.

[2] Leading up to trial, EcoFactor asserted three patents relating to

been presented to the jury.

Second, the district court erred in denying Google JMOL of non-infringement of the '327 patent because EcoFactor failed to present sufficient evidence that the Accused Products "receive[] temperature measurements from inside the structure . . . conditioned by [an] HVAC system." Appx102 at 9:29-32, claim 1.

Third, the district court erroneously denied summary judgment of patent ineligibility under Section 101. The asserted patents claim abstract concepts without reciting any improvements upon HVAC or computer technology. Instead, the patent claims are directed to processes that a named inventor and EcoFactor's own technical expert admit can be performed by the human mind—i.e., comparing inside and outside temperatures over time to determine whether an HVAC system is on or off ('488 patent), calculating the rate of change of inside temperature and changing thermostat settings to reduce electricity demand ('327 patent), and controlling an HVAC system based on

_____

HVAC systems—U.S. Patent Nos. 8,412,488 ("'488 patent"), 8,738,327 ("'327 patent"), and 10,534,382 ("'382 patent"). EcoFactor had initially asserted, but voluntarily dropped, a fourth patent, U.S. Patent No. 8,180,492.

building occupancy ('382 patent). Moreover, by the patent specifications' own admission, the claims recite the use of conventional components to implement these abstract concepts.

EcoFactor's appellate arguments should be rejected. Its complaints about the district court's decision to grant JMOL of no willfulness and no inducement fail because EcoFactor did not present sufficient evidence to support either claim. EcoFactor's appeal of the court's decision, in exercising its inherent trial-management authority, to treat source code as a demonstrative also lacks merit. EcoFactor failed to preserve any objections to the court's decision in any event.

Further, contrary to EcoFactor's assertions, the district court correctly invalidated the '488 patent for indefiniteness. The fatally uncertain scope created by the '488 patent claims' recitation of an illogical apples-to-oranges comparison between "inside temperature" and an "estimation for the rate of change in inside temperature" was confirmed by EcoFactor's own technical experts, who disagreed on whether the claims call for a temperature-to-temperature comparison or a rate-to-rate comparison. Given their competing atextual interpretations of the same illogical language, the district court

properly found the '488 patent claims indefinite.

## STATEMENT OF THE CASE

### I.   Asserted Patents

#### A.   '488 and '327 patents

The '488 and '327 patents are related, with the latter being a continuation of the former.  Their common patent specification describes a system that predicts how temperatures measured inside a structure would change in response to outside temperatures.  Appx81 at 3:25-4:13.  The hypothesized system compares indoor and outdoor temperature measurements over time to derive an estimate of the rate of change in inside temperature for a given outside temperature.  Appx83 at 7:48-54.   The system then compares the estimated rate with an actual measurement to determine whether the HVAC system is on or off.  Appx83 at 7:55-64.

The specification describes using networked, "conventional" components—e.g., "conventional computers," "processors such as those sold by Intel and AMD," "handheld wireless devices," "random access memory (RAM) . . . or other method of storing data"—to practice the claimed inventions.  *See* Appx82 at 5:19-55, Appx80 at 1:40-52 (describing programmable thermostats in the prior art).  Such

components are configured using known networking technology, including: the "World Wide Web," "HTML," "websites," "local area networks . . . [including] wireless data systems," internet browsers such as "Microsoft Explorer, Mozilla, Firefox, Opera or Safari," "operating system such as Microsoft windows, Apple Mac OS, Linux, Unix or the like," and "Ethernet, wireless protocols such as IEEE 802.11, IEEE 802.15.4, Bluetooth, or other wireless protocols." *See* Appx82 at 5:1-6:26.

Claim 1 of the '488 patent recites the following functions of a "system for monitoring the operational status of an HVAC system" that comprises an "HVAC control system" and "one or more processors":

(a) receiving temperature measurements from a structure conditioned by an HVAC system;

(b) receiving outside temperature measurements from a source other than the HVAC system;

(c) comparing the inside temperature of the structure and the outside temperature over time to derive an estimation for the rate of change in the inside temperature in response to the outside temperature; and

(d) comparing a temperature recorded inside the structure with the estimation for the rate of change in inside temperature to determine whether the HVAC system is on or off.

Claim 1 of the '327 patent recites a "system for controlling the operational status of an HVAC system" that comprises a "thermostat" in communication with "one or more servers" via a network, and performs functions similar to functions (a)-(c) of '488 patent claim 1 above. Unlike the '488 patent, however, '327 patent claim 1 does not require that anything be done with the estimation derived by function (c) above, and instead detours to the following functions:

(d) receiving a demand reduction request and determining whether the structure is associated with the request; and

(e) if the structure is associated with the request, sending a signal to the thermostat to change its setting to reduce electricity demand by the HVAC system.

At trial, EcoFactor asserted claim 5 of the '327 patent, which requires that the estimation derived in claim 1 be a prediction about the future rate of change in inside temperature. *See* Appx102 claim 5. Mr. Scott Hublou, a named inventor, confirmed that the data and

calculations described in the provisional applications to which the asserted patents claim priority involved "rudimentary math on Excel spreadsheets and graphing." Appx1171; *see also* Appx1172. Mr. Hublou further confirmed that he could perform the "rate of change" calculation "in his head." *See* Appx1166-1167. EcoFactor's validity expert, John Palmer, likewise confirmed that a human could "sit there with a pencil and paper and write down a whole bunch of temperatures and times" and "then tak[e] that data and analyz[e] it" to "compar[e] inside and outside temperatures over time and develop[] from that an estimated rate of change," as recited by the '488 and '327 patent claims. Appx1181, Appx1182. Dr. Palmer also confirmed that the claimed "rate of change" calculation was essentially determining the slope between two points on a graph. *See* Appx1179-1180.

## B.    '382 patent[3]

The '382 patent describes saving energy by turning off an HVAC system when a building is unoccupied. Appx104, Appx117 at 1:17-25,

---

[3] The Patent Trial and Appeal Board issued a final written decision determining that all claims of the '382 patent were obvious over Geadelmann in view of Ehlers. *See* 22-1971, ECF 35 at 15. EcoFactor's appeal of that decision has been treated as a companion to the instant case and has been assigned to the same merits panel.

2:35-59. Although the patent admits that turning off an HVAC system when a building is unoccupied was known in the prior art, the '382 patent purports to improve upon this by detecting occupancy "without requiring the installation of additional hardware." Appx118 at 3:15-41.

Like the '488 and '327 patent claims, the claims of the '382 patent recite the use of components like an "HVAC system," "memory," "processors with circuitry and code," "sensors," and "network" for performing certain functions. *See* Appx120-121 at claims 1-20. The '382 patent specification also discloses that the claimed invention may be carried out by the same "conventional" components as those discussed above. *See, e.g.*, Appx118-120 at 4:24-7:2.

## II. Accused Products

Google Nest offers a broad range of home electronic products, including the three accused thermostats: (1) Nest Learning Thermostat (3d. Gen.), (2) Nest Thermostat E, and (3) Nest Thermostat (collectively, "Accused Products"). *See* Appx5894-5896. Consistent with Nest's mission to make "simple, beautiful, thoughtful things" from otherwise "unloved products" like thermostats, Nest designed the Accused Products to appear physically attractive, while offering advanced

technological capabilities that allow consumers to save energy while also staying comfortable. *See* Appx5832, Appx6425-6427.

Nest's decision to prioritize the industrial design of the Accused Products presented a challenge for Nest's engineers. *See* Appx5900-5901. Because Nest's thermostats are designed to be completely enclosed in metal, plastic, and/or glass housings without air vents or sensors in contact with the surrounding air, they cannot directly detect the actual ambient air temperature like other thermostats. *See* Appx5898-5899. Instead, Nest relies on a complex series of calculations using as inputs internal temperature and power readings from sensors within the enclosed device to estimate the surrounding ambient temperature of the structure. *See* Appx5900-5901, Appx5916. When in use, the components within the thermostat generate considerable heat, making the temperature within the device hotter than the surrounding environment. Appx5904-5905. Nest's algorithm applies advanced mathematical concepts and is developed and maintained by a team of engineers led by Dr. Eric Burger. Appx5893, Appx5901.

### III.   District Court Proceedings

#### A.    Pretrial proceedings

##### 1.    Section 101

Google filed a motion for summary judgment that the asserted claims of the '488, '327, and '382 patents were invalid under 35 U.S.C. § 101. After argument at the pretrial conference, the district court ruled that it would "deny the motion for summary judgment," and also "submit the second part of the 102 [sic, should be 101] test to the jury." Appx5046.

##### 2.    Indefiniteness

Google also filed a motion for summary judgment that the asserted claims of the '488 patent were indefinite for reciting language requiring a comparison between "an inside temperature" and an "estimation for the rate of change in inside temperature." *See* Appx84 at 9:41-45. EcoFactor's validity expert interpreted this claim language as requiring a comparison between two ***rates of change*** in inside temperature, whereas EcoFactor's infringement expert interpreted the same language as requiring a comparison between two ***inside temperatures***. *See* Appx1686, Appx1700-1701. After argument at the pretrial conference, the district court found this claim language

14

indefinite.

### 3. Daubert of EcoFactor's damages expert

Google moved to exclude the opinion of EcoFactor's damages expert, Mr. Kennedy because, *inter alia*, he had no data to support a reasonable royalty of ██NRR██ per unit, and the licenses upon which he relied were not comparable. The district court denied Google's motion. Appx2254.

### 4. Treatment of Google's source code

After addressing motions at the pretrial conference, the district court responded to EcoFactor's request for guidance regarding the parties' disagreement over how to handle Google's source code at trial. *See* Appx5132-5133. The court explained, "I see no reason . . . why the source code couldn't be used as a demonstrative, I doubt that anyone on the jury needs to have the source code or would understand [it]." Appx5133. The court decided to adopt a procedure where both parties could use and show source code to the jury as a demonstrative, but the court would tell the jury that, as with all demonstratives, it would not receive copies of source code. *See* Appx5133. EcoFactor acknowledged without objecting to the court's procedure. Appx5134.

**B.    Trial**

**1.    EcoFactor's damages theory**

This case was tried in early 2022.  During trial, Mr. Kennedy opined that EcoFactor was entitled to a royalty of NRR per unit. Appx5740.  To reach his conclusion, he relied on settlement agreements between EcoFactor and three licensees: Schneider Electric USA, Daikin Industries, and Johnson Controls.

All three agreements were executed after EcoFactor had already sued Google in January 2020; granted licenses to EcoFactor's entire portfolio of 30+ patents; and specified one-time, lump-sum payments to settle litigation.  Additionally, each agreement contained a "whereas" clause asserting EcoFactor's belief that the lump sum represented a royalty of NRR per unit for the licensee's past and projected sales. EcoFactor, however, did not possess any licensee's sales data. Appx5691, Appx5695, Appx5697-5698.

- The Schneider settlement agreement was executed in June 2020.  Appx10400-10410.  The agreement listed seven patents EcoFactor asserted again Schneider, including the '327 patent.  The agreement called for Schneider to pay a

one-time, lump-sum payment, but within the same clause, the parties agreed that "[s]uch amount" was "not based upon sales and does not reflect or constitute a royalty." Appx10402. The agreement also included a "whereas" clause, again stating that "***EcoFactor*** represents that it has agreed to the payment set forth in this Agreement based on what ***EcoFactor*** believes is a reasonable royalty calculation of ▮NRR▮ per-unit for what it has estimated is past and projected future sales of products accused of infringement in the Litigation, although nothing in this clause should be interpreted as agreement by Schneider that ▮NRR▮ per unit is a reasonable royalty." Appx10400.

- The Daikin settlement agreement was executed in April 2020. Appx10389-10399. The agreement listed seven asserted patents, including the '327 patent, and also stated ***EcoFactor's*** representation of its belief regarding a ▮NRR▮ per-unit royalty. Appx10389. Daikin disputed that its lump-sum payment was based on its sales or reflected a royalty. Appx10391.

- The Johnson settlement agreement was executed in July 2021 and listed four asserted patents. Appx10411-10419. The '327 patent had neither been asserted against Johnson, nor listed in the agreement. The agreement required a one-time, lump-sum payment. Appx10413. Again, in a "whereas" clause, the agreement stated that "*EcoFactor* represents that it has agreed to the payment set forth in this Agreement based on what *EcoFactor* believes is a reasonable royalty calculation of ▮NRR▮ per-unit for estimated past and Johnson Control's projected future sales of products accused of infringement in the Litigation." Appx10411.

Based on these settlement agreements, and specifically their whereas clauses, Mr. Kennedy opined that EcoFactor was entitled to ▮NRR▮ per unit as a reasonable royalty. EcoFactor's CEO, Mr. Shayan Habib, testified that EcoFactor's "baseline policy" was to offer licensees a per-unit royalty rate of ▮NRR▮. Appx5671. Mr. Habib admitted, however, that neither he nor any other EcoFactor employee had seen the licensees' sales numbers. *See* Appx5691, Appx5695, Appx5697-5698.

Mr. Kennedy based his **NRR** opinion on the whereas clauses and Mr. Habib's testimony.[4]  Mr. Kennedy testified that like Mr. Habib, he had **not** seen Daikin's, Schneider's, or Johnson's past or projected unit sales.  *See* Appx5804, Appx5794, Appx5797, Appx5806.  Indeed, EcoFactor presented **no** evidence of actual or projected numbers of unit sales by which the lump sums could be divided to calculate a **NRR** per-unit royalty.  *See, e.g.*, Appx5806.  Moreover, two of the settlement agreements provided that the lump sums did **not** constitute a royalty. Appx10391 § 3.1; Appx10402 § 3.1.  Furthermore, Mr. Kennedy acknowledged that no licensee had ever paid EcoFactor an ongoing royalty of **NRR**.  Appx5811.  And EcoFactor presented no current or projected data on the market share or sales of the licensees.[5]

---

[4] Mr. Kennedy purported to perform an apportionment analysis, by reviewing a 2019 survey of prospective customers of smart thermostats that weighed the relative importance of product features.  He then applied those weights to Nest's gross profits.  Appx5757.  For example, because 20% of prospective customers attributed importance to "energy savings," he attributed 20% of Google's per-unit profits to the '327 patent.  Appx5757.  Using this method, he opined that because Google's per-unit profits attributed to the accused features were higher than **NRR**, his proposed royalty rate was "conservative."  Appx5757, Appx5821.

[5] The only reference to market share data at trial was from 2016. Appx10467, Appx6532.

Relying on Mr. Habib's statements and EcoFactor's "whereas" representations, Mr. Kennedy opined that EcoFactor was entitled to **NRR** per unit no matter how many asserted claims or patents were found infringed. Appx5774. Mr. Kennedy concluded that EcoFactor was entitled to **alleged damages** million in past damages for infringement of the '327 and the '382 patents. Appx5782.

## 2. Use of source code at trial

Throughout trial, and consistent with the district court's pretrial ruling, the parties treated source code as a demonstrative and never introduced it into evidence, notwithstanding EcoFactor's listing of over 500 pages of source code on a pretrial exhibit list. During both witness testimony and attorney arguments, the parties repeatedly displayed source code on an ELMO or a special computer Google arranged for the parties to use. *See, e.g.*, Appx5537, Appx5562, Appx5599, Appx5640-5641, Appx5657. Source code was displayed during the testimony of three witnesses, spanning three days of trial.

For EcoFactor's infringement case on the '382 patent, its expert, Mr. de la Iglesia, testified about source code relating to Google's "Home/Away" and "Eco Mode" and "Eco Manager" functions. *See, e.g.*,

Appx5538-5541, Appx5555-5556.  Mr. de la Iglesia relied on (and the jury saw) the "███████ source code ███████" code at issue.  Appx5543, Appx5556-5557.  EcoFactor rested its case-in-chief without ever seeking to move that source code into evidence.  *See* Appx5823.  EcoFactor also used the "███████ source code ███████" code in cross-examining Google's witnesses, *see* Appx5958, Appx6160-6161, and in closing argument.  *See* Appx6520, Appx6525-6526, Appx6526.

Only once did EcoFactor move to admit into evidence any source code,[6] but EcoFactor immediately withdrew its motion with no argument or court ruling after Google objected:

> MR. PICKENS: And, Your Honor, plaintiff moves to admit the physical exhibit of the source code into evidence.
>
> MR. LAM: Your Honor, we object. May I approach?
>
> THE COURT: Yes.
>
> MR. PICKENS: Your Honor, I'll withdraw it actually. I'll withdraw it.

Appx5457-5458.  In front of the jury, on the second day of trial, the

---

[6] That code related to EcoFactor's allegations for the '327, not '382, patent.

district court then reiterated that source code was "not going to be admitted into evidence, but it can be used as a demonstrative, which is probably the best way to do it anyway," and that "[i]t's not in evidence, and it's not coming in evidence at this point." Appx5458. The court added that source code could "be used as a demonstrative, which means it won't be an exhibit of record, but the jury's going to be able to see it." Appx5458. Both sides continued to show source code as a demonstrative as described above.

At the close of evidence, the district court provided the jury with clear instructions regarding the evidence it was to consider based on the Fifth Circuit's model instructions. Later, during deliberations, the jury sent a four-word note that said, "occupancy determination source codes," unaccompanied by any question or request. Appx6569. In response, the court told the jury: "Ladies and gentlemen, you have all the evidence that was admitted during the trial and you must resolve all the questions based on the evidence that you have." Appx6569. Only then did EcoFactor object to not providing source code (which EcoFactor had never sought to admit) to the jury during deliberations, but the court reiterated its previous guidance that "what we agreed was

[the source code] would be shown," but not admitted into evidence. Appx6569-6570. After the jury sent another note that they believed "all the ['382 patent] claims have been infringed on except Line 51 through 56," Appx6571, EcoFactor made oral and written arguments that the jury should be provided source code during deliberations despite it never having been admitted into evidence. Appx6572-6580. But the court confirmed its decision to treat source code as a demonstrative and not admit it into evidence, and declined EcoFactor's request to send information not in evidence to the jury during deliberations. *See* Appx6580-6581. The court ultimately declined to give any further instruction in response to the jury's note. Appx6585. After two days of deliberations, the jury concluded that Google did not infringe the asserted claims of the '382 patent. Appx44-51.

### 3. JMOL of no willfulness and no inducement

At trial, EcoFactor relied on communications EcoFactor had with Google in 2015 and 2018 in pitching a potential acquisition.

- In 2015, Mr. Habib tried to interest Google in acquiring EcoFactor by providing his "buddy" at Google, Scott McGaraghan, a general corporate overview. Appx10890. In conveying Mr. Habib's

message to others at Google, Mr. McGaraghan said he did not have "tons of detail" but EcoFactor's "CEO . . . feels [] they have pretty strong IP." Appx10890. There was no mention of any specific EcoFactor patent or any reference to current or potential Google products. Google passed on EcoFactor's pitch.

- In 2018, Mr. Habib again solicited an acquisition through another "friend" at Google, Abraham Yacobian. Appx5716. Mr. Habib emailed Mr. Yacobian an "EcoFactor Overview," including a list of 30 patents. Appx5710-5720. As Mr. Habib admitted, EcoFactor sent its list not to put Google "on notice of infringement," but to "discuss[] possible opportunities." Appx5720.

After EcoFactor rested, Google moved for JMOL of no willfulness and no inducement. Appx6218-6225. Finding that EcoFactor presented "no evidence" Google had pre-suit notice alleged infringement, and that Google's "continu[ing] to manufacture and sell" was insufficient given Google's "vigorous defense," the district court granted Google's motion on willfulness. Appx6231. And after initially denying it without prejudice, Appx6230, the district court also granted Google's motion on inducement. Appx6378.

### 4. Post-trial motions

Google timely renewed its motion for JMOL of non-infringement of claim 5 of the '327 patent, and invalidity of the asserted claims of the '327 and '382 patents under Sections 101-103. Google also moved for a new trial on the grounds that the district court should have excluded Mr. Kennedy's opinion and its prejudicial **NRR** per-unit royalty rate. The court denied both motions. *See* Appx6662, Appx6688.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's denial of Google's motion for a new trial on damages because first, Mr. Kennedy's opinion lacked any reliable methodology, instead resting on EcoFactor's unilateral representation in settlement agreements of "what EcoFactor believes is a reasonable royalty calculation of **NRR** per-unit." Second, Mr. Kennedy flouted the requirement that the portfolio licenses he proffered be comparable to a license resulting from the hypothetical negotiation for the patents-in-suit. Instead, Mr. Kennedy simply asserted the parties would agree in a hypothetical negotiation that a license to **any** subset of EcoFactor's patent portfolio would result in an identical royalty rate of **NRR** per unit.

This Court should also reverse the district court's denial of Google's motion for JMOL of non-infringement of the '327 patent as the jury's verdict lacked substantial evidence. The evidence showed the Accused Products neither receive nor measure inside temperature, but rather calculate an estimate of inside temperature and thus do not literally infringe the '327 patent. Moreover, no substantial evidence supports infringement under the doctrine of equivalents because the Accused Products' technique of deriving an estimate of inside temperature (i.e., using Nest's algorithms) is substantially different from the plain claim language.

Finally, this Court should reverse the district court's denial of Google's motion for summary judgment of invalidity as to the '488, '327, and '382 patents under Section 101. The claims are patent-ineligible because they are directed to abstract ideas and lack inventive concepts. Specifically, the '488 patent claims the abstract idea of determining whether an HVAC system is on or off by comparing the actual inside temperature with a derived estimation, and the related '327 patent claims the abstract idea of changing the thermostat setting in response to a request to reduce energy usage. *See* Op. Br. at 3. Similarly, the

'382 patent claims the abstract idea of changing the thermostat setting based on a building's occupancy. *See id.* at 4.

Regarding EcoFactor's appeal, this Court should affirm the district court's grant of JMOL of no willfulness and no inducement. The district court correctly concluded that EcoFactor presented no evidence it provided Google notice of alleged infringement. Moreover, the district court's invalidation of the '488 patent and the jury's verdict of non-infringement of the '382 patent demonstrate that Google's defenses were substantial, contrary to EcoFactor's current arguments (which EcoFactor did not raise in district court).

This Court should also affirm the district court's exercise of its discretion to consistently treat source code as a demonstrative at trial and to decline to send such demonstratives to the jury during deliberations. Having never objected to treating source code as a demonstrative at the pretrial conference and during trial and having withdrawn its only attempt to introduce any source code into evidence, EcoFactor did not preserve its objection to the district court's proper treatment of source code as a demonstrative. Further, EcoFactor suffered no prejudice because both parties repeatedly showed the jury

the source code during witness testimony and argument. In any event, substantial evidence supports the jury's non-infringement verdict on the '382 patent notwithstanding any alleged error in the district court's handling of source code.

This Court should likewise affirm the district court's grant of summary judgment of indefiniteness of the asserted claims of the '488 patent. The district court correctly found that the disputed claim limitation—comparing "an inside temperature" with an "estimation for the rate of change in inside temperature," Appx84 at 9:41-45—is indefinite because it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention," *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indeed, EcoFactor's own experts had materially different interpretations of this indefinite limitation.

## STANDARD OF REVIEW

This Court "review[s] denial of post-trial motions for JMOL and new trial under regional circuit law." *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1312 (Fed. Cir. 2010). In the Fifth Circuit, a new trial is warranted where "[1] the verdict is against the

weight of the evidence, [2] the damages [amount] awarded is excessive, [or (3)] the trial was unfair or [marred by] prejudicial error." *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991); *see* Fed. R. Civ. P. 59(a)(1). The district court's evidentiary rulings are "show[n] considerable deference," and are reviewed "only for abuse of discretion." *Johnson v. Ford Motor Co.*, 988 F.2d 573, 578 (5th Cir. 1993). Trial courts are afforded this "considerable deference" because of their "superior knowledge of the trial scene" and the need to "enable[e] the trial judge to keep the trial on course." *Hardy v. Chemetron Corp.*, 870 F.2d 1007, 1009 (5th Cir. 1989).

"The Fifth Circuit reviews the grant or denial of JMOL *de novo*." *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012). Under Fifth Circuit law, a jury's verdict must be supported by substantial evidence to be upheld. *Id.* Substantial evidence is "more than a mere scintilla," but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biodex Corp. v. Loredan Biomedical Inc.*, 946 F.2d 850, 859 (Fed. Cir. 1991).

## ARGUMENT

### I.  The district court erred in denying Google's motion for a new trial on damages.

The district court abused its discretion in denying Google's motion for a new trial.  For two independent reasons, Mr. Kennedy's opinion never should have been admitted.

*First*, Mr. Kennedy's ▮NRR▮ opinion lacked any reliable methodology or underlying calculations.  Instead, Mr. Kennedy's damages model rested on EcoFactor's unilateral representation of "what EcoFactor believes is a reasonable royalty calculation of ▮NRR▮ per-unit" for the portfolio-wide patents licensed to Schneider, Daikin, and Johnson.  EcoFactor's CEO merely testified that EcoFactor's "policy" was to license any part of its patent portfolio at that rate.  But neither he nor Mr. Kennedy had any sales-volume information that could demonstrate ▮NRR▮ actually represented a per-unit royalty paid by the licensees.  And all three licenses were for small lump sums, not running royalties.  Furthermore, Mr. Kennedy disregarded two licensees' statements disclaiming ▮NRR▮ as a per-unit royalty.  Mr. Kennedy's opinion was thus unreliable and should not have gone to the jury.

*Second*, Mr. Kennedy flouted the requirement that the portfolio

licenses be comparable to a license emerging from the hypothetical negotiation. Instead, Mr. Kennedy asserted the parties would agree that a license to *any* subset of EcoFactor's patent portfolio would result in an identical royalty rate of ▮NRR▮ per unit. Despite acknowledging that both asserted patents remaining in the case had value, he opined that whether a hypothetical litigant licensed only one or both, the per-unit royalty rate would be the same as the rate for all patents in EcoFactor's portfolio. Mr. Kennedy's failure to account for the differences between the claimed invention of the '327 patent and the patents in the purportedly comparable settlement agreements defies basic principles of patent damages and renders his opinion unreliable.

### A. Mr. Kennedy's damages model was speculative and conclusory.

Mr. Kennedy relied solely on EcoFactor's transparent attempt to manufacture a per-unit royalty rate by including unilateral "whereas" references to ▮NRR▮ in settlement agreements executed after EcoFactor sued Google.

EcoFactor offered no evidence of how ▮NRR▮ could be calculated, or whether the licensees actually applied a ▮NRR▮ per-unit royalty in arriving at the agreed-upon lump sums. Mr. Kennedy admitted he had

never seen the licensees' past or projected sales figures, that no one at

EcoFactor had access to the sales data, and that it wasn't possible to

calculate a per-unit royalty "without having that information."

Appx5802.  Undeterred, however, Mr. Kennedy insisted NRR per unit

was a reasonable royalty without any licensee sales figures or

projections.  Mr. Kennedy also ignored licensee statements to the

contrary, disputing NRR as a per-unit royalty.  *See* Appx10391,

Appx10400.

Opinions like Mr. Kennedy's here have been deemed unreliable.

In *Pavo Solutions LLC v. Kingston Technology Company, Inc.*, 2019 WL

8138163, at *5 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir.

2022), for example, the court excluded an expert opinion on a per-unit

royalty derived from a license agreement, because the expert admitted

that she "ha[d] no knowledge or evidence of sales figures under [the]

agreement."  *Id.*  Similarly, in *Wordtech*, this Court refused to uphold a

damages award based in part on two lump-sum agreements, because

"[n]either license describe[d] how the parties calculated each lump sum,

the licensees' intended products, or how many products each licensee

expected to produce."  609 F.3d at 1320.  And "when asked" at oral

argument "if the record supplied any idea of the volume of sales or projected sales, Wordtech's counsel admitted . . . [that] none of that was discussed." *Id.*; *see also MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021) (opinion unreliable where expert "offered no testimony as to how the $21 million lump-sum payment could be converted to any royalty rate").

As in *Pavo*, Mr. Kennedy was "incapable" of demonstrating how the lump sums had been arrived at, because he lacked the "relevant sales numbers . . . required to derive an accurate royalty rate." *Pavo*, 2019 WL 8138163, at *5. And as in *Wordtech*, Mr. Kennedy had no "idea of the [licensees'] volume of sales or projected sales." 609 F.3d at 1320. But worse than in those cases, where the opinions were "based only on speculation or guesswork," *Wordtech*, 609 F.3d at 1320, here, ▮NRR▮ was both Mr. Kennedy's starting and ending point. He did not calculate ▮NRR▮, and his opinion was based on the self-serving "whereas" clauses that EcoFactor's counsel inserted into settlement agreements executed after EcoFactor sued Google.

Insistent on a royalty rate of ▮NRR▮, Mr. Kennedy disregarded the explicit statements within those very agreements disputing ▮NRR▮ as a

per-unit royalty. Daikin and Schneider disagreed that they paid lump sums reflecting a per-unit royalty rate. *See* Appx10391, Appx10400. This Court has rejected opinions from damages experts that were similarly untethered to the facts of the case. *See MLC Intell.*, 10 F.4th at 1368 (affirming exclusion of testimony where expert's proposed royalty rate "rest[ed] on an inference from [a clause in the agreement] that [went] well beyond what the clause implie[d] and [was] incompatible with the [license] agreement as a whole"). Mr. Kennedy's opinion here is untethered to any actual or reliable facts such that his royalty rate is effectively "plucked . . . out of nowhere" and should have been excluded. *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1351 (Fed. Cir. 2018). Thus, the district court abused its discretion in denying Google's motion for a new trial.

## B. Nothing in EcoFactor's proffered settlement agreements attributed the alleged per-unit royalty to the value of the '327 patent.

The district court also should have excluded Mr. Kennedy's opinion for lack of comparability and apportionment. Damages owed to the patentee must reflect the value of only the patented improvement. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir.

2021). "No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). The patentee bears the burden to establish that any licenses it relies on are sufficiently comparable such that apportionment is "effectively baked into the purportedly comparable license[s]." *Omega*, 13 F.4th at 1377, 1380 (remanding for new trial on damages where patentee failed to show portfolio licenses were comparable to hypothetical negotiation involving single patent).

In *Omega*, for example, this Court rejected a damages theory based on allegedly comparable licenses that failed to "account[] for apportionment." 13 F.4th at 1379.[7] Omega's president testified that "under Omega's licensing program, the licensing fee was five dollars per unit whether it's one patent or 50 patents." *Id.* "[R]elying on Omega's licensing arrangement," along with several portfolio licenses that "generally carry a royalty rate of at least $5.00 per unit," Omega's

_____

[7] Before addressing Omega's comparable license theory, the Court rejected Omega's argument that apportionment was unnecessary because CalAmp's "sales were driven primarily, if not exclusively, by the invention of the [patent found infringed]." *Id.* at 1378.

damages expert testified that CalAmp "should pay [a per-unit royalty rate of $5.00] . . . no matter how many claims or how many of the patents it infringes." *Id.* This Court vacated the damages award and remanded for a new trial, concluding that Omega had failed to account for "distinguishing facts between the proffered licenses and the hypothetical negotiation over a single-patent license." *Id.* at 1380. "Most glaringly," the licenses Omega proffered each involved "numerous patents, in contrast to a hypothetical negotiation for a single-patent license." *Id.* Because Omega's damages expert had "merely identified such differences," without "me[eting] its obligation to account for such distinguishing facts," Omega had "failed to show that [the] agreements attributed [the] per-unit royalty to the value of the [infringed] patent." *Id.* at 1379-81.

To support a ███ per-unit royalty here, EcoFactor relied on settlement licenses to EcoFactor's entire portfolio of over 30 patents (and all future patents and applications). But Mr. Kennedy did not even attempt to account for the value that the '327 patent represented within that portfolio. Instead, like Omega's damages expert, Mr. Kennedy acknowledged that EcoFactor's proffered "license agreements

[were] for the portfolio," but concluded that the two patents asserted at trial (themselves a subset of those in EcoFactor's complaint) would have been the "focus" of the hypothetical negotiation, with "the rest of the patents . . . thrown in," "either for nothing or very little additional value." Appx5767-5768, Appx5810. Mr. Kennedy even opined that EcoFactor was entitled to an identical per-unit royalty of ███, regardless of the number of patents or claims found infringed. Appx5767-5768, Appx5810. But as in *Omega*, "absent evidence of a comparable license or comparable negotiation to support an identical [royalty] rate for a one-patent license to the [infringed] patent," Mr. Kennedy's "patent/claim-independent approach" fails to "account[] for apportionment." *Omega*, 13 F.4th at 1379.

Mr. Kennedy's opinion is not saved by Mr. Habib's testimony that EcoFactor's "baseline policy" was to license its patents for a minimum of ███ per unit. Appx5671. Allowing Mr. Kennedy to rely on Mr. Habib's testimony without establishing comparability "would improperly permit [EcoFactor] to hide behind its generic licensing arrangement to avoid the task of apportionment." *Omega*, 13 F.4th at 1379. Because Mr. Kennedy failed to account for the significant

differences between the three proffered licenses and a hypothetical license to the '327 patent, his damages opinion was unreliable and should have been excluded.

This Court recently rejected as unreliable Mr. Kennedy's damages opinion in a similar scenario. In *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971-72 (Fed. Cir. 2022), Mr. Kennedy relied upon "three comparable agreements" that licensed "Wi-LAN's portfolio." Mr. Kennedy opined, as he did here, that "in practice, only a handful of valuable patents drive the royalty rate for a license." *Id.* at 972. Wi-LAN's former CEO also testified that generally in a licensing negotiation, the "parties focus on a handful of key patents," with other patents added for a "marginal upcharge" like "throwing in the chaff with the wheat." *Id.* On this basis, Mr. Kennedy testified that the patents in the hypothetical negotiation were "the key patents" in the purportedly comparable agreements. *Id.* To account for the rest of the portfolio, Mr. Kennedy then "reduced [his proposed] royalty rate by 25 percent," *id.* at 973.

This Court rejected Mr. Kennedy's approach as "untethered to the facts of the case." *Id.* First, some of the licenses upon which Mr.

Kennedy relied as comparable did not even list the patents in the hypothetical negotiation as "Asserted Patents." *Id.* Thus, there was "no basis" from which to conclude that the patents in the hypothetical negotiation were the "key patents" in the purportedly comparable licenses. *Id.* Second, even the license that listed one of the asserted patents in the hypothetical negotiation "also list[ed] five other 'Asserted Patents,'" but "Mr. Kennedy failed to address the extent to which these other patents contributed to the royalty rate." *Id.* In light of these "methodological and factual errors in analyzing the comparable license[s]," this Court ordered a new trial on damages. *Id.* at 974.

The Court's reasoning in rejecting Mr. Kennedy's opinion in *Apple v. Wi-LAN* applies equally here. Schneider and Daikin, against whom the '327 patent was asserted, also faced *six* other asserted patents. But Mr. Kennedy did nothing to address "the extent to which those other patents contributed to the" amount paid by Schneider or Daikin. *Id.* at 973. Worse than in *Apple v. Wi-LAN*, here, Mr. Kennedy did not purport to apply *any* discount for the other patents licensed in the supposedly comparable agreements, let alone the 25% discount that the Court found insufficient in *Apple v. Wi-Lan*. *Id.* As in that case, here,

"Mr. Kennedy's silence on these equally situated patents is troubling and makes his opinion unreliable." *Id.* at 973-74.

And as in *Apple v. Wi-Lan*, the '327 patent was not even asserted against all the allegedly comparable licensees here. The '327 patent was not asserted against Johnson, Appx10411, and thus to the extent the '327 patent was at all relevant to the Johnson negotiations, that "license[] treated the ['327 patent] as chaff, not wheat," *id.* at 973. Furthermore, "[t]here is also no evidence that the ['327 patent] was discussed in negotiations" for the Johnson license, and thus there is "no basis upon which to conclude . . . that the [Johnson] license is a meaningful proxy for the royalty rate of the ['327] patent." *Id.*

Given Mr. Kennedy's failure to establish that the three licenses were comparable, his opinion should have been excluded, and the district court abused its discretion in denying Google's motion for a new trial.

## II. The district court erred in denying JMOL of non-infringement because the jury's finding of infringement of the '327 patent was not supported by substantial evidence.

The district court erred in denying JMOL of non-infringement of the '327 patent, because the evidence at trial did not adequately support

the conclusion that the accused thermostats satisfy the claim limitation of "receiv[ing] temperature measurements from inside the structure . . . conditioned by [an] HVAC system." Appx102 at 9:29-32 (claim 1 from which claim 5 depends). Rather than receiving inside temperature measurements of the HVAC-conditioned structure, the evidence demonstrated that each accused thermostat executes an algorithm to estimate the ambient temperature.

## A. The evidence showed the accused thermostats derive estimates rather than receive measurements of inside temperature and thus do not literally infringe the '327 patent.

The district court gave the term "temperature measurements from inside the structure" its plain and ordinary meaning. Consistent with such plain meaning, claim 1 itself distinguishes the function of "receiv[ing] . . . measurements" (Appx102 at 9:29-32) from "deriv[ing] an estimation" (Appx102 at 9:43-44). Thus, receiving measurements (in limitation 1[a]) necessarily differs from deriving an estimation (in 1[c]) per the plain claim language. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("use of two terms in a claim requires that they connote different meanings");

*compare* Appx98 at 1:34-42, Appx100 at 6:13-16 (disclosures of

thermostats measuring temperature), *with* Appx99 at 3:31-37, Appx101

at 7:51-55 (disclosures of estimates or predictions).

The evidence at trial showed that, contrary to the plain language

of the '327, the accused thermostats do not (and indeed cannot) receive

measurements of the HVAC-conditioned, inside temperature. Instead,

they ***derive an estimate*** of inside temperature using a complex

temperature compensation algorithm ("TCA"). The documentary

evidence (including source code) and witness testimony showed that

each Nest thermostat has an enclosed housing (of metal, plastic, and/or

glass) with no vents and no temperature sensor in contact with the

surrounding air or environment. Thus, unlike thermostats

contemplated by the '327 patent, the accused thermostats lack the

means to measure the inside temperature of the HVAC-conditioned

structure (including by way of detecting the temperature of surrounding

air that would otherwise pass through vents). *See, e.g.*, Appx10199-

10202, Appx10273-10275, Appx5895-5896, Appx5898-5899, Appx6092.

The accused thermostats contain multiple sensors that measure

internal conditions—such as temperature or power consumption—of the

components within the device's fully enclosed housing. *See* Appx10199-10202, Appx10765, Appx5596, Appx5598, Appx5895, Appx5899-5901, Appx5831-5832; *see also* Appx6092-6093. The measurements of internal temperature or power consumption are inputs to the TCA, which derives an estimate of the ambient or room temperature of the environment outside of the thermostat. *See* Appx10199-10202, Appx10765, Appx5596, Appx5598, Appx5895, Appx5899-5901, Appx5831-5832; *see also* Appx6092-6093. Contrary to EcoFactor's expert's testimony, the TCA does not measure a first room temperature and then refine its accuracy.

The accused thermostats' inability to measure inside temperature was a direct result of Nest's decision to prioritize "industrial design"—i.e., the look and feel of each product—above all else, which in turn presented Nest's engineers with quite a challenge. Appx5900-5901, Appx5833, Appx5895, Appx5898, Appx6091-6092, Appx6427, Appx6431-6432. Rather than being able to measure ambient temperature like other thermostats, Nest's engineers design the TCA of each Nest thermostat to calculate an estimate of ambient temperature relying on temperatures and power consumption detected by internal

sensors within the enclosed device. As the Nest engineer responsible for the TCA, Dr. Burger, explained, the devices generate considerable heat such that internal temperatures within the device itself could be significantly hotter than the ambient temperature outside the device. Appx5904-5905. On cross-examination of Google's expert, EcoFactor took issue with how close the sensed, internal temperature could be to actual ambient temperature, but did nothing to change the undisputed fact that the accused thermostats rely on TCAs to derive estimates of ambient temperature rather than measure actual ambient temperature. *See* Appx6149-6151.

The only other evidence EcoFactor presented at trial on this contested "measurements" limitation was: (1) cross-examination of Google's expert about documents not admitted into evidence or which establish that the thermostats derive temperature estimates, (2) testimony of EcoFactor's expert, Mr. de la Iglesia, who improperly interpreted and equated the "measurements" claim language with "deriving an estimation," and (3) high-level, non-technical statements from public webpages about the Accused Products. *See* Appx5597, Appx5461-5462, Appx10420-10434, Appx5927, Appx6154, Appx6435-

6436. Even taken together, there is not substantial evidence in the record to support the jury's infringement verdict.

First, the cross-examination testimony of Google's expert that EcoFactor relied on in its JMOL opposition amounted to having the expert read from two documents, PTX-941 and PTX-948, that were never admitted into evidence. *See* Appx6151-6155 (Dr. Turnbull being cross-examined about PTX-941 and PTX-948); Appx6167-6168. But EcoFactor may not use an expert to "parrot[] an out-of-court statement" that is otherwise inadmissible, in an attempt to transform that information into admissible evidence capable of supporting the jury's verdict. *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014).

Second, to support his infringement opinion, Mr. de la Iglesia repeatedly and improperly equated "measurement" with a derived estimate when characterizing the claim and the operation of the accused thermostats. *See* Appx5597 (Mr. de la Iglesia testifying, "The **measurement is** the **estimate** that is **derived** from this algorithm."), Appx5597 ("I think it's certainly correct that the inside temperature **measurement** comes from the internal **estimation** algorithm."). He also repeatedly and misleadingly said "measurement" in place of what

the evidence established was an estimate calculated by the TCA. *See* Appx5461 (mischaracterizing the TCA defined by the source code as "taking readings from sensors and improving the accuracy of those readings in—such that the ***measurement*** [estimate calculated by TCA] that is going up to the server will be of the highest accuracy possible"), Appx5461 ("And what this is describing is that the temperature, the ***measurement*** [estimate calculated by TCA] that's actually generated, comes from some accuracy refinements that are occurring within the Nest Thermostat"), Appx5462 ("these are known mathematical methods to generate accurate ***measurements*** [estimates calculated by TCA] from measurements which might be less accurate"), Appx5462 (a "compensation algorithm . . . generates ***measurements*** [estimates calculated by TCA]").  The impropriety of Mr. de la Iglesia's "measurement" testimony is further confirmed by EcoFactor's own IPR representations purporting to distinguish "temperature measurements" from averaged or calculated temperatures, which contradict its position here for purposes of alleged infringement.[8]  Had EcoFactor been faithful

---

[8] Google respectfully requests that the Court take judicial notice of the IPR proceedings (IPR2022-00473) for related U.S. Patent No. 8,751,186, which shares with the '327 patent common Provisional Application No.

to the plain claim language, the jury would have been required to find that the accused thermostats do not "measure" ambient temperature and that the calculated estimates derived by the TCA do not satisfy the "receiv[ing] temperature measurements" limitation of claim 5. *See Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022 (Fed. Cir. 2020).[9]

Third, the only piece of documentary evidence cited by EcoFactor as supporting the jury's verdict came from Google's public-facing website. *See* Appx10888. The website's high-level description provided

---

60/994,011, overlapping specifications and claim language, and the same inventors. *See Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1316 n.4 (Fed. Cir. 2013) ("It is proper to take judicial notice of a decision from another court or agency at any stage of the proceeding, even if it was not available to the lower court."). Therein, EcoFactor distinguished the claimed "temperature measurement" from a calculated average temperature: "An average temperature is not an actual temperature measurement. Further, an average temperature can be calculated and then the actual temperature measurements can be discarded." October 26, 2022 Patent Owner's Response at 29.

[9] To the extent Mr. de la Iglesia's improper equating of the "measurement" claim language to the TCA's calculations—which contradicts the claim's own distinction between temperature measurements and derived estimations—created a further claim-construction dispute, it should not have been left for the jury to resolve. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

no technical details of the accused thermostats and did not mention the TCA at all, let alone explain how it works. *See* Appx6435-6436; *see also* Appx5927-5828. This high-level description was clarified and put into proper context not only by the Google product manager and engineer responsible for the TCAs but also by record evidence containing engineering design specifications as well as the source code defining the functionality of the TCAs. *See* Appx10199-10201, Appx10765, Appx5895, Appx5895-5896, Appx5898-5899. The high-level and technically imprecise product description that EcoFactor relied on is not legally sufficient to support the jury's infringement verdict.

## B. No substantial evidence supports infringement of the '327 patent under the doctrine of equivalents.

EcoFactor's argument under the doctrine of equivalents likewise rested on its improper equating of "measurement" with a derived estimation. EcoFactor's expert urged the jury to find that the doctrine of equivalents was satisfied because "there [was] no material difference between . . . what is in the claim and what is actually performing it." Appx5463. By improperly ignoring the difference between the plain meanings of measurements and derived estimations, EcoFactor's expert

encouraged the jury to make an erroneous finding under the doctrine of equivalents.

Even setting aside his improper claim interpretation, EcoFactor's expert provided only conclusory statements on the doctrine of equivalents. *See* Appx5465 (testifying that his "conclusion was that they meet this requirement literally but also under the Doctrine of Equivalents"); Appx5467 ("Even if somebody said that it wasn't in exactly the same way but it's—it would be, you know, immaterially different, it would still infringe under the Doctrine of Equivalents."); Appx5619-5620 ("And even under Doctrine of Equivalents, the test—it would be more than satisfied."). His conclusory testimony cannot overcome the evidence from Google's engineer that the TCA's calculation of an estimate of room temperature using data on internal component temperature and power consumption is substantially different from measuring ambient room temperature. Indeed, solving the challenge created by the Nest thermostats' enclosed design required substantial and sustained effort by a team of engineers, led by Dr. Burger, to develop a TCA for each accused thermostat. Appx5901-5902, Appx5906-5914, Appx6103. Nest's software algorithms for deriving

estimates of inside temperature were therefore substantially different from "measuring" such temperature with sensors exposed to ambient air.

Lacking substantial evidence to support the jury's verdict, the district court erred in failing to grant JMOL of non-infringement of claim 5 of the '327 patent.

## III.    The asserted claims of the '488, '327, and '382 patents are patent-ineligible.

The patents-in-suit claim abstract ideas implemented with conventional components without providing any improvement to HVAC or computer technology.  Such claims purport to preempt or "improperly t[ie] up the future use of these building blocks of human ingenuity" and therefore are patent-ineligible under 35 U.S.C. § 101.  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014); *see also id.* at 223 ("mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020) ("improv[ing] a fundamental practice or abstract process by invoking a computer merely as a tool" is insufficient to confer eligibility).

**A.    This Court should review the district court's denial of summary judgment *de novo* because no factual disputes prevented resolution of patent eligibility as a matter of law.**

Patent eligibility is ultimately an issue of law for this Court to review *de novo*. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). While the determination of patent eligibility may involve underlying issues of fact, "[w]hen there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, [and] conventional . . . , this issue can be decided on summary judgment as a matter of law." *Berkheimer*, 881 F.3d at 1368; *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1359 (Fed. Cir. 2018) (though section 101 inquiry may involve questions of fact, pretrial resolution is permitted when the purported inventive concept is "based merely on the idea of using existing computers or the Internet to carry out conventional processes, with no alteration to computer functionality"). Neither EcoFactor nor the district court identified any factual disputes that should have prevented summary judgment from being granted. *See* Appx5030-5046. Moreover, as discussed further below, EcoFactor's expert and one of the

named inventors agreed that the functions recited in the patent claims could be carried out in the human mind, or using conventional, off-the-shelf components.

> **B.** **The '488 patent claims the abstract idea of comparing the measured inside temperature with a derived estimation to determine whether an HVAC system is on or off.[10]**

Although wordy, the asserted claims of the '488 patent express nothing more than the idea of using changes in indoor temperature to determine whether an HVAC system is on or off. As set forth above, claim 1 recites four basic functions—(a) taking indoor and outdoor temperature measurements, (b) deriving an estimated rate of change of

---

[10] Without stating that the asserted claims were directed to abstract ideas, the district court submitted the *Alice* step two inquiry to the jury, which this Court has since suggested might have been improperly left for the jury to resolve. *Compare CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1376 (Fed. Cir. 2022) ("First, we examine whether the claims are 'directed to' a law of nature or natural phenomenon. If—and only if— they are, then we proceed to the second inquiry, where we examine whether the limitations of the claim apart from the law of nature or natural phenomenon, considered individually and as an ordered combination, 'transform the nature of the claim' into a patent-eligible application.") *with CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (concluding that the Court "need not answer this [step one] question," because "the claims satisfy *Alice* step two"); *see also id.* at 1101 (J. Reyna, concurring) ("Step two is rendered superfluous and unworkable without step one.").

indoor temperature, (c) comparing that estimated rate to actual indoor temperature, and (d) using that comparison to determine whether an HVAC system is on or off. But all four functions can be performed by a human with pen and paper. No dispute exists over whether the claimed functions can be carried out by a human or in the human mind—both EcoFactor's own co-inventor and its expert admitted as much. *See* Appx1166-1167 (claimed calculations could be performed "inside [his] head"); Appx1171 (data and calculations in patent application involved "rudimentary math on Excel spreadsheets and graphing"); Appx1173-1175 (hand-drawn graphs generated using Excel formed the basis of the patent figures); Appx1181-1182 (admitting that humans could carry out the steps and calculations required by the patent claims).

Further reinforcing their abstractness, the asserted claims recite aspirational results without explaining "how?". Claim 1 contains no instructions for how the admittedly conventional computer "derive[s] an estimation of the rate of change," which a human can do based on personal observation and rudimentary calculation. Even the patent specification lacks any algorithmic disclosure for the same, as confirmed by its co-inventor. Appx1164. EcoFactor's claims are like those held

invalid in *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950 (Fed. Cir. 2017), which required collecting data and then validating data "by applying an algorithm engine." *Id.* at 952. Clarilogic's claims were directed to an abstract idea because "the algorithm engine mentioned in the claim is not claimed, identified, or explained." *Id.* at 954. Where "a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory." *Parker v. Flook*, 437 U.S. 584, 595 (1978).

Contrary to this evidence, EcoFactor argued on summary judgment that the patents recited a concrete improvement to conventional HVAC control systems by "tak[ing] the thermal mass of the structure into account." Appx1881. But the concept of thermal mass is mentioned in the patent specification only in passing, *see, e.g.*, Appx83 at 7:24-28, and not in the asserted claims at all. Rather, the claims concern determining whether the HVAC system is on or off by comparing the actual inside temperature with a predicted rate of change without reciting any concrete improvement to conventional HVAC operation. Indeed, the only thermal property recited in any of

the asserted claims is temperature.

EcoFactor's other core argument amounts to saying that the "claimed advance" of the '488 patent is an Internet-connected thermostat. *See* Appx1882-1883; *see also* Appx1801. In support of this argument, EcoFactor pointed to Figure 4, which is "a high-level schematic of the thermostat used as part of the subject invention." Appx81 at 4:28-29. Figure 4 shows the claimed thermostat as comprising conventional components: an antenna, wireless modem, thermistor, relay, microprocessor, display, switches, memory, and a power supply. *See* Appx1883. Despite annotating Figure 4 with color, EcoFactor offered no explanation of how any of the components were unconventional or represented a technical improvement in HVAC operation. In fact, the specification discloses using conventional, off-the-shelf components to implement the claimed invention. *See* Appx82 at 5:1-6:26.

Even assuming EcoFactor is correct that the claimed invention is an "internet-connected device," merely placing an abstract idea in the realm of computer networks—that are "conventional" by the patent's own admission—does not transform the idea into something patent-

eligible.  The relevant inquiry is whether the claims are directed to a

"specific means or method that improves the relevant technology"

rather than a "result or effect that itself is the abstract idea and merely

invoke[s] generic processes and machinery."  *Apple, Inc. v. Ameranth,*

*Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016).  Claims, such as those

asserted here, that use computers merely as conventional tools and do

not recite an improvement in computer technology are not patent-

eligible.  *See, e.g.*, *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d

1355, 1364-65 (Fed. Cir. 2021); *Customedia*, 951 F.3d at 1365; *Elec.*

*Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).  The

claims here "do not focus on an improvement in computers as tools, but

on certain independently abstract ideas that use computers as tools."

*SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018).

Moreover, nothing in the asserted claims "enable[s] computers to

operate more quickly or efficiently, nor do they solve any technological

problem."  *Customedia*, 951 F.3d at 1365.  By contrast, *Uniloc USA, Inc.*

*v. LG Elecs. USA, Inc.*, 957 F.3d 1303 (Fed. Cir. 2020), upon which

EcoFactor relied below, involved patent claims directed to specific

improvements to the manner in which data was transmitted wirelessly

as non-abstract improvements to computer-network technology itself.
The claims asserted here, however, merely use conventional computers
and components as tools to automate processes such as recording and
storing temperatures and estimating a rate of change. *See Elec. Power
Grp.*, 830 F.3d at 1353 (asserted claims were directed to an abstract
idea because they involved "collecting information, analyzing it, and
displaying certain results").

The instant claims are therefore easily distinguished from the
Supreme Court's pre-*Alice* decision in *Diamond v. Diehr*, 450 U.S. 175
(1981). Contrary to EcoFactor's suggestion, the asserted claims'
recitation of a "rate of change" calculation based on a law of nature like
Newton's law of heating and cooling,[11] does not insulate them from a
Section 101 challenge. *Diehr* holds only that use of a well-known
mathematical equation is not determinative of invalidity—rather, a
court must look to whether the formula "implements or applies [it] in a
structure or process which, [] considered as a whole, is performing a

---

[11] Newton's law of heating and cooling, dating back over 300 years,
describes "the rate of change of temperature as a function of time as
being proportional to the difference between an object's temperature
and the temperature of its surroundings." Appx1191-1192.

function which the patent laws were designed to protect." *Id.* at 192; *see also Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1297-98 (Fed. Cir. 2020) (claims directed to a law of nature or mathematical formula not patent-eligible unless they include additional steps that "transform[] the process into an inventive application of the formula").  To the extent the claims involve any use of a law of nature or mathematical formula, they are unlike the claims in *Diehr* and *Thales*, as they do not improve upon prior methods or functions.  Instead, the claims are more akin to the ineligible claims in *Flook*, which involved a method for updating alarm limits where the only purportedly novel feature was a mathematical formula.  *Id.* at 585.  In *Flook*, even though the mathematical formula was applied for a specific purpose, the Court held that deeming the claimed method patentable would be like saying that "the formula $2\pi r$ can be usefully applied in determining the circumference of a wheel." *Id.* at 595.  Such is the case here.  The claimed "rate of change" estimation—which can be calculated by applying Newton's law—is not being applied to solve a novel technological problem.  Instead, it is being used to calculate a structure's rate of change in temperature over time just as Newton

postulated over 300 years ago.  *See* Appx1655.

**C.    The '327 patent claims the abstract idea of automating the changing of thermostat settings in response to energy-reduction requests.**[12]

Stripped of excess verbiage, claim 1 of the '327 patent recites two basic but disjointed functions: (1) similar to the '488 patent above, comparing inside and outside temperatures over time to derive an estimated rate of change in inside temperature in response to outside temperature, and (2) changing the thermostat setting in response to a request to reduce energy usage.

As discussed above, via dependency from claim 1, asserted claim 5 recites a sequence of functions, the first three of which are nearly identical to those in '488 patent claims 1 and 9.  *See* section I.A *supra* (limitations (a)-(c)).  The '327 patent claims merely add the step of changing a thermostat setting in response to a demand reduction request, which requires coupling the thermostat with a computer

---

[12] The related '488 and '327 patents share a common specification, and their respective claims recite overlapping limitations.  For the overlapping claim limitations, the arguments above regarding the '488 patent are incorporated by reference here.  Google separately addresses in this section the '327 claim limitations that differ from those of the '488 patent.

network to receive demand reduction requests and determining whether they apply to the recipient. But such functionality is similar to the idea this Court found abstract in *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019), of "communication over a network for interacting with a device," just applied here to controlling a conventional HVAC system. *See id.* at 768.

Like the '488 patent, the essential claimed functions of the '327 patent can be performed by humans. In fact, the demand reduction process recited in '327 patent claim 5 does not rely on computations or calculations at all. It simply requires receiving a request, determining that the request is for a demand-reduction participant, and then acting on the request by sending a signal to change the thermostat setting, something humans are not only capable of doing, but do all the time when they change their thermostat settings to avoid high pricing during peak hours. Devoid of any claim limitations defining how the recited functions are carried out, the claim would cover any thermostat communicating over a computer network with a utility about demand reduction requests, "thus preempting the entire industry's ability to use" computer-connected thermostats to help utilities reduce power

consumption at peak times. *See ChargePoint*, 920 F.3d at 770. Merely

performing functions over a computer network, as recited by the claims

here, does not transform the claims into something that is patent-

eligible. *See, e.g., Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935

F.3d 1341, 1348 (Fed. Cir. 2019); *Enfish, LLC v. Microsoft Corp.*, 822

F.3d 1327, 1335-36 (Fed. Cir. 2016). The claims are therefore abstract

and fail *Alice* step one.

### D. The '382 patent claims the abstract idea of automating the changing of thermostat settings based on building occupancy.

The '382 patent claims are directed to the abstract idea of

automatically changing thermostat settings based on whether a

building is occupied. Claim 1, from which claims 2 and 12 depend,

recites the following sequence of functions that are performed by

conventional components: (a) receiving "first data" including a

measured characteristic of the building; (b) receiving "second data" from

outside the building; (c) storing historical values of the first and second

data; (d) receiving non-occupancy and occupancy temperature setpoints;

(e) receiving user commands regarding HVAC temperature setpoints; (f)

sending user-specific data about the building and HVAC system; and (g)

controlling the HVAC system based on determining whether the building is occupied. Claims 2 and 12 do not add substantive limitations—claim 2 merely requires that an operational temperature be a second setpoint if the building is unoccupied, while claim 12 merely requires that the first among "one or more processors" determine building occupancy. *See* Appx121, claims 2 and 12.

These claims are directed to the same core idea of controlling HVAC operation based on building occupancy in which "computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335-36. The claims recite conventional components—HVAC system, memory, processors with circuitry and code, sensors, and a network. Even the patent specification admits that only "conventional" components are necessary to practice the claimed invention. *See, e.g.*, Appx118-119 at 4:38-5:25.

Moreover, all the claimed functions can be performed by a human. At bottom, adjusting a thermostat based on whether a building is occupied is what people have done manually for as long as HVAC systems and thermostats have existed. Automating this manual activity using generic components does not make the '382 patent claims any less abstract. *See Chamberlain Grp.*, 935 F.3d at 1348 ("the mere

physical nature of [the] claim elements . . . is not enough to save the claims from abstractness, where the claimed advance is directed to the wireless communication of status information using off-the-shelf technology for its intended purpose").

Further, other than stating that "processors . . . execute instructions," the '382 patent claims do not recite "how" to receive or send any of the data in functions (a) through (f), nor do they recite "how" to determine building occupancy or to control the HVAC system per function (g). *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). At their core, these claims are like those invalidated in *Clarilogic*, which were directed to an abstract idea because "the algorithm engine mentioned in the claim is not claimed, identified, or explained." 681 F. Appx. at 954. "[A] method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction." *Id.* Here, reciting a litany of functions for which "processors . . . execute instructions," without even purporting to define those instructions, is a textbook example of abstractness under *Alice* step one.

**E. No disputed facts preclude concluding as a matter of law that the asserted claims of the '488, '327, and '382 patents lack an inventive concept.**

"To save a patent at [*Alice*] step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017). The inventive concept must supply "significantly more" than the abstract idea itself, *BSG Tech, LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1289-90 (Fed. Cir. 2018), and must comprise more than "well-understood, routine, conventional" or "purely functional" claim elements. *Alice*, 573 U.S. at 224-26; *see also Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1364 (Fed. Cir. 2020) (even "a new abstract idea is still an abstract idea").

Here, EcoFactor presented no facts, which if taken as true, would have raised a question as to whether the asserted claims include an inventive concept to make them patent eligible. On summary judgment, EcoFactor failed to articulate any inventive concept beyond the abstract idea of a "computer-networked HVAC control system, with all the other specific claimed advances." Appx1895-1896. Without stating what these "other specific claimed advances" are, EcoFactor insisted that the "ordered combination of all the claim elements are

inventive," but gave no explanation to support this bare assertion. Appx1895-1896.[13] Nor did EcoFactor even specify what was new, novel, or inventive about the purported order, much less substantiate its significance. EcoFactor's conclusory assertion of an inventive concept based on an ordered combination thus fails. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

In search of an inventive concept in the '488 and '327 patent claims, as with its *Alice* step one argument, EcoFactor again relied on the specification's reference to thermal mass, asserting that prior to the claimed invention, an HVAC system had "no mechanism by which it might take the thermal mass of the structure into account, but thermal mass significantly affects many parameters relating to energy

---

[13] EcoFactor did not present any evidence to dispute Google's showing that the asserted claims recite generic components. *See* Appx1140, Appx1142-1144; *see also Alice*, 573 U.S. at 223 (as discussed in conjunction with step one, "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"); *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1371 (Fed. Cir. 2015) (claims "applying an abstract idea, restricted to the Internet, on a generic computer" "do not address problems unique to the Internet" and are patent-ineligible).

efficiency." Appx1895 (quoting '488 at 3:1-4; 2:52-67). But regardless of whether EcoFactor's characterization is true, it is irrelevant to the *Alice* step two question of whether the claims contain an inventive concept since, as explained above, thermal mass is not in any of the asserted claims. *See Two-Way Media*, 874 F.3d at 1338 ("To save a patent at step two, an inventive concept must be evident in the claims.").

As for the '382 patent, EcoFactor seems to advance two purportedly "inventive concepts," hoping that one of them sticks—either that the claimed thermostat is able to "take into account more than two variables" or that the claimed HVAC system includes an occupancy detection system that uses a motion sensor not electrically connected to the HVAC system. Appx1895. The problem with both purported "inventive concepts," however, is that EcoFactor merely rehashes and repackages the same abstract ideas. *See Simio*, 983 F.3d at 1364 ("a claim for a new abstract idea is still an abstract idea"); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) ("The abstract idea itself cannot supply the inventive concept, 'no matter how groundbreaking the advance.'").

The only "evidence" EcoFactor relied on in support of its *Alice* step

two argument consisted of citations to the patent specifications and three pieces of extrinsic evidence, none of which shows an inventive concept: one internal EcoFactor and one Nest document describing EcoFactor and Nest products, respectively, without any connection to the patents-in-suit (let alone asserted claims); and conclusory testimony from a co-inventor that the "combination" of the '488 patent was not "conventional at the time." First, EcoFactor's internal document describes a product that has never been shown to embody the asserted claims. And even setting that aside, the evidence upon which EcoFactor relies shows that the only purported inventive concept is that the HVAC system was "networked" to "collect[] specific information from numerous sources," adding nothing to the attorney argument in EcoFactor's briefing below. Appx1896 (citing Ex. D at v). Second, the conclusory inventor deposition testimony elicited by EcoFactor's counsel similarly fails to explain why the claimed combination was unconventional. Third, EcoFactor's citations to internal *Nest* documents are wholly unrelated to the *Alice* step two inquiry and merely a bald attempt to manufacture some semblance of a factual dispute when none exists.

At bottom, no genuine dispute of material fact precluded summary

judgment of ineligibility. Though EcoFactor asserted that "the above evidence creates numerous issues of fact under *Alice* Step Two," Appx1898, EcoFactor did not set forth any specific facts showing that there was a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial"). And the district court did not identify any factual issue as precluding summary judgment either at oral argument or in its summary order denying the motion. *See* Appx5046, Appx2254.

Further, even if there was a genuine issue of fact that precluded summary judgment, for all the reasons stated above, no reasonable jury could have found that the elements of the asserted patent claims, when taken individually and as an ordered combination, were anything but well-understood, routine, and conventional. At trial, the testimony of co-inventor Scott Hublou and Google's invalidity expert David Williams confirmed that the claimed hardware components were, as the patents themselves acknowledge, conventional and were used in a conventional

way.  *See* Appx5390-5391, Appx6344, Appx6373-6374, Appx6376.
EcoFactor's rebuttal expert, Dr. Palmer, did not meaningfully contest
the conventionality of the components or the functions recited in the
'327 and '382 patent claims in the two minutes of his direct examination
devoted to this topic, simply asserting that the components were
unconventional without explaining why this was so.  *See* Appx6449-
6450.

## IV.    The district court correctly granted JMOL of no willfulness and no inducement.

"To establish willfulness, a patentee must show that the accused
infringer had a specific intent to infringe at the time of the challenged
conduct."  *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch.
Org.*, 28 F.4th 1247, 1274-75 (Fed. Cir. 2022); *Bayer Healthcare LLC v.
Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) ("[W]illfulness requires
deliberate or intentional infringement.").  EcoFactor presented no such
evidence.

The primary evidence that EcoFactor relies on to show Google's
specific intent is correspondence soliciting a potential acquisition of
EcoFactor.  But as the district court observed, these communications
between Mr. Habib and his contacts at Google did not put Google on

notice of alleged infringement; instead, they concerned business opportunities for EcoFactor. The 2015 correspondence **never mentioned any patent**, contrary to EcoFactor's assertion that it "informed Google about its patents, including the '327 patent, in 2015." Op. Br. at 26. EcoFactor's reliance on Mr. McGaraghan's general recounting that EcoFactor believed it had "strong IP," *id.* at 4-5, also fails to establish any knowledge of specific patents, let alone a "specific intent" to infringe the '327 patent. *See BASF Plant Sci.*, 28 F.4th at 1274-75 ("knowledge of the asserted patent . . . is necessary, but not sufficient, for a finding of willfulness").

As for the 2018 correspondence, EcoFactor's "corporate overview" deck is also insufficient. Appx5675. As Mr. Habib testified at trial, EcoFactor provided Google with a business overview, including a list of patents in EcoFactor's portfolio, to explore a potential acquisition, not to provide notice of alleged infringement by any Google product. *See* Appx5720. Even if this interaction were sufficient to establish Google's awareness of the '327 patent, it still fails to show Google's intent to infringe. Indeed, evidence that a defendant was "aware and kept track of [the plaintiff's] patents"—far beyond what is present here—remains

insufficient to show willfulness.  *BASF Plant Sci.*, 28 F.4th at 1274-75.[14]

Contrary to EcoFactor's characterization, the district court did not

"disregard[]" EcoFactor's communications, Op. Br. at 24, but instead

properly concluded that without any evidence "that Google was aware"

of EcoFactor's infringement allegations, there was "no evidence to

[present] the jury."  Appx6228.

Lacking evidence of Google's specific intent to infringe, EcoFactor

improperly raises for the first time on appeal that willfulness could be

established by the alleged unreasonableness of Google's defenses.

Moreover, EcoFactor effectively disparages any argument that the jury

did not adopt as "unreasonable" per se.  But without any evidence of

Google's subjective intent, evidence that Google's defenses were

---

[14] As the district court determined, the other evidence EcoFactor relies
on to establish Google's intent clearly fails, including evidence that
some EcoFactor employees left and ended up at Google, Google's general
"competitive relationship with EcoFactor," and Google's review of
"EcoFactor's products and technologies."  *See* Op. Br. at 21-22.
Testimony that Nest engineers do not review patents without
consulting a lawyer is "unremarkable."  *SRI Int'l, Inc. v. Cisco Sys., Inc.*,
14 F.4th 1323, 1326 (Fed. Cir. 2021) (noting that engineers failing to
review asserted patents until their depositions is "unremarkable").
Finally, EcoFactor's assertion that Google "conducted diligence on
EcoFactor's patents including the '327 patent" is false, and ***none*** of
EcoFactor's citations to the Appendix show otherwise.

objectively unreasonable would be insufficient to establish willfulness. *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1119 (Fed. Cir. 2022) (describing that "willfulness . . . rest[s] on the subjective intent of the accused infringer").  In any event, Google's defenses were not objectively unreasonable.  As detailed above, Google vehemently disputes the jury's finding as to claim 5 of the '327 patent.[15] Furthermore, Google was successful on its non-infringement and indefiniteness arguments for the other patents-in-suit.  And contrary to EcoFactor's characterization of Google's reliance on the Ehlers '330 reference for invalidity, the PTO recently rejected claim 5 of the '327 patent during reexamination in light of prior art including that very reference.[16]  Thus, the district court was correct to conclude there was no evidence sufficient to allow willfulness to go to the jury.

The district court also correctly granted Google's motion as to

---

[15] As discussed above, EcoFactor itself distinguishes temperature measurements from calculated temperatures in the '186 IPR.  *See supra*, n.9.

[16] Google respectfully requests that the Court take judicial notice of the *ex parte* reexamination proceedings for the '327 patent, Reexamination Control No. 90/014,915, including the PTO's September 12, 2022, Non-Final Office Action and EcoFactor's Response to that Action.

inducement.  Indeed, "to succeed on a claim of inducement," the

patentee must show the defendant acted to bring about acts of

infringement by others and had "knowledge that the induced acts

constitute patent infringement." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d

1278, 1286 (Fed. Cir. 2020).  Here, there is no such evidence, and the

district court's conclusion should be upheld.[17]

## V.    The district court correctly declined to grant EcoFactor a new trial on the '382 patent.

The district court's decision to treat and allow presentation of

source code as a demonstrative but not admit it into evidence was

proper and well within the court's inherent trial-management

authority.  Further, the court's jury instructions were legally sound and

followed circuit precedent.  Indeed, EcoFactor did not preserve any

objection to the treatment of source code as a demonstrative or to the

jury instructions.  Finally, the jury's non-infringement verdict as to

claims 2 and 12 of the '382 patent was amply supported by the evidence

at trial.  For all these reasons, this Court should uphold the district

---

[17] If the Court agrees EcoFactor presented insufficient evidence of infringement as to the '327 patent, there can be no inducement for lack of the predicate requirement of direct infringement, and EcoFactor's appeal of the ruling of no inducement is moot.

court's denial of EcoFactor's new trial motion.

## A. The district court's handling of source code was proper.

The district court's decision to consistently treat source code as a demonstrative throughout trial was within its sound discretion. *Jon-T Chems., Inc. v. Freeport Chem. Co.,* 704 F.2d 1412, 1417 (5th Cir. 1983) (per curiam). Courts have wide latitude to manage evidence presented in the courtroom. *United States v. Garcia*, 334 F. App'x 609, 614 (5th Cir. 2009) ("Federal Rules of Evidence 611 confers on trial courts discretion to control the presentation of evidence, including the use of demonstrative evidence."). Here, the district court exercised proper discretion to manage evidence in the courtroom by treating as a demonstrative highly technical and sprawling but interconnected source code, which the jury would not understand outside the context of witness explanations on the topic. The district court had the inherent authority to do so under Rule 611, regardless of whether source code exhibits themselves were admissible.

## B. The district court's jury instructions were legally sound.

EcoFactor challenges the district court's jury instructions on two

grounds, neither of which establishes error or an abuse of discretion.
*See i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir.
2010) (citing *Baker v. Canadian Nat'l/Ill. Cent. R. R.*, 536 F.3d 357,
363-64 (5th Cir. 2008)) (district court possesses "broad discretion to
compose jury instructions," which are reviewed for abuse of discretion).
First, EcoFactor mischaracterizes as an erroneous instruction the
district court's stray comment that the jury would have access to the
source code during deliberations, but the court's comment was not a
jury instruction. *See* Appx5458. Even if there were any momentary
confusion, the court immediately clarified and confirmed source code is
"***not in evidence, and it's not coming in evidence*** at this point. It
can be used as a demonstrative, which means ***it won't be an exhibit of***
***record***, but the jury's going to be able to see it," which is exactly and
properly how source code was handled at trial. Appx5458. *See also*
*United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000)
(demonstratives "are not admitted into evidence and should not go to
the jury room absent consent of the parties").

    Second, to the extent that EcoFactor now purports to challenge
the district court's actual jury instructions after the close of evidence

and before jury deliberations, EcoFactor has not shown: "(1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000) (applying Federal Circuit and Fifth Circuit law). In fact, EcoFactor fails to satisfy any of these four factors.

EcoFactor did not timely object to the jury instructions, neither making nor preserving any objection at the appropriate time under Federal Rule of Civil Procedure 51(c), which "requires a party to object to jury instructions in order to preserve a claim of error" with a "specific, formal, on-the-record objection.'" *Jimenez v. Wood County, Tex.*, 660 F.3d 841, 844-45 (5th Cir.2011) (en banc). EcoFactor never objected with specificity to the district court's instructions and thus has not preserved its argument for a new trial on that basis.

EcoFactor has further failed to show that the district court's instructions were legally erroneous, such that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Hartsell v. Dr. Pepper Bottling Co.*

*of Tex.,* 207 F.3d 269, 272 (5th Cir. 2000).  That EcoFactor never

objected was no surprise because the district court's instructions were

based on the Fifth Circuit's model jury instructions.  *Compare*

Appx6472 *with* 5th Circuit Pattern Jury Instruction 3.3.  Based on

those model instructions, the district court instructed the jury to "make

your decision based only on the evidence that you heard here in court,

nothing else."  Appx6474.  When the jury sent its note about "occupancy

determination source codes," the court correctly reiterated that the jury

had "all the evidence that was admitted during the trial and you must

resolve all the questions based on the evidence that you have."

Appx6569.

    Nor has EcoFactor shown that it requested alternative

instructions that would have remedied the alleged error.  The only

alternative EcoFactor proposed was after the jury had already been

charged and was in the middle of deliberations.  *See* Appx6581-6582,

Appx6584-6585.  But the district court was correct to refuse to change

its instructions to the jury during deliberations, because those

instructions were proper and especially given the parties' consistent use

and handling of source code based thereon during trial including closing

arguments.  *See HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12

F.4th 476, 487 (5th Cir. 2021) (refusing the plaintiff's requested

instruction did not affect its ability to present its case because the

court's instructions were legally accurate and the plaintiff covered the

substance of its proposed instruction during its closing argument).

Finally, as discussed further below, EcoFactor has failed to show

that the purportedly erroneous instruction had prejudicial effect.

### C. EcoFactor failed to preserve its objection to the district court's proper treatment of source code as a demonstrative.

EcoFactor failed to preserve any argument that the district court's

treatment of source code as a demonstrative was improper.  To preserve

an issue for a new trial, "[a] party may claim error in a ruling to admit

or exclude evidence only if . . . a party[] on the record . . . timely objects

or moves to strike" stating the specific ground of objection.  Fed. R.

Evid. 103(a); *see also United States v. Lewis*, 796 F.3d 543, 546 (5th Cir.

2015) ("Rulings on evidence cannot be assigned as error unless the

nature of the error was called to the attention of the judge, so as to alert

him to the proper course of action").

The proper time for EcoFactor to object was at the pretrial

conference.  But EcoFactor never timely argued for admitting source code into evidence and never stated any objection to the district court's pretrial ruling.  *See* Appx5133-5134.  Instead, the parties proceeded to treat source code as a demonstrative throughout the entire trial. EcoFactor only objected to the court's treatment of source code during jury deliberations, but such "tardy arguments" raised post-trial are disfavored.  *Risher v. Aldrige*, 889 F.2d 592, 595 (5th Cir. 1989).

EcoFactor's argument that ***Google*** somehow waived the ability to object to the admission of source code printouts in opposition to EcoFactor's motion for a new trial is both wrong and irrelevant to the issue before this Court.  Google did, in fact, object to EcoFactor's only attempt to move into evidence a set of source code printouts (pertaining to EcoFactor's infringement allegations for the '327 and not the '382 patent).  *See* Appx5457.  Immediately after Google objected, EcoFactor withdrew its motion without giving the district court a chance to rule on EcoFactor's motion and without making any argument for admitting source code into evidence.  *See* Appx5457.  Google therefore had no need or opportunity to lodge any further objection that EcoFactor now accuses Google of waiving.

## D. Substantial evidence supports the jury's non-infringement verdict for the '382 patent.

To receive a new trial, EcoFactor must show that the verdict was against the great weight of the evidence, *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838-39 (5th Cir. 2004), which it cannot do. Here, the weight of the evidence supports the jury's finding that Google did not infringe the '382 patent. In particular, the Google engineers responsible for the accused products and corresponding source code, as well as Google's expert witness, credibly explained how remote cloud servers, not the accused Nest thermostats, make the occupancy determination required by the asserted '382 patent claims. *See* Appx120, claim 1 (reciting a processor that is "located remotely" and "not electrically connected" to "determine whether the building is occupied or unoccupied"). These witnesses explained how Google's Home/Away feature relies on cloud servers that make occupancy determinations based on inputs from various Nest devices like thermostats, smoke detectors, and smart door locks, as well as the user's smartphone. *See, e.g.*, Appx5928-5929, Appx5934-5935, Appx5937-5941, Appx6000-6001, Appx6108-6110.

Google's witnesses explained how the cloud servers calculate occupancy and what design choices led the engineering teams to use the servers, rather than the thermostats themselves, to make occupancy determinations. *See, e.g.*, Appx5928 (Google's servers run a formula "that is responsible for collecting information from all of the products in a customer's home and making the determination of whether the home is occupied or not"); Appx5929 (occupancy determination by the server was a deliberate design choice to avoid the situation where two thermostats in the home detected conflicting information); Appx6108, Appx6110-6111. Google's witnesses also explained how Google designed Home/Away to make the occupancy determination at the server to take into account input from "as many signals from as many devices and as many sensors in the home as possible," like a smoke detector and a geofence, for example. Appx6005-6006; *see also id.* (the server is the "only place" that is aware of all the inputs from the different sensors and devices within the structure to be able to make the Home/Away determination). Because occupancy determinations are made by the servers and not the thermostats, Google does not infringe the '382 patent. *See* Appx6122-6124.

Rather than rely on evidence in support of its argument that the district court erred in denying it a new trial, EcoFactor speculates about the jury's deliberations and its resulting verdict. *See, e.g.*, Op. Br. at 30 (attributing the jury's scratched-out notation on the verdict form to Google's source code not having been admitted into evidence); Op. Br. at 33 (characterizing the "meaning" of a jury note stating only "occupancy detected source codes" without any further explanation or explicit request). Nowhere does EcoFactor point to any record evidence to support its argument that if the jury would have had access to the source code at issue, the verdict would have been different. The type of bare speculation upon which EcoFactor's argument relies is not enough to warrant a new trial. *See Dresser-Rand Co.*, 361 F.3d at 838-39.

## VI. The district court correctly found the '488 patent claims to be indefinite.

The district court was correct to grant summary judgment of indefiniteness of the '488 patent claims because the plain language of the "comparison" limitation was nonsensical and subject to contradictory interpretations, as demonstrated by EcoFactor's own experts. "[A] patent is invalid for indefiniteness if its claims . . . fail to inform, with reasonable certainty, those skilled in the art about the

scope of the invention." *Nautilus, Inc.*, 572 U.S. at 901. As EcoFactor

notes in its Opening Brief, indefiniteness is therefore "decided from the

viewpoint of persons skilled in the field of the invention." Op. Br. at 43

(quoting *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358,

1360 (Fed. Cir. 2022)).

Here, the claims of the '488 patent require comparing "an inside

temperature" with an "estimation for the rate of change in inside

temperature." Appx84 at 9:41-45. This comparison between a

temperature (in degrees) and a rate of change in that temperature (in

degrees over a unit of time, i.e., a time-based derivative of the

temperature) is an apples-to-oranges comparison that cannot be

performed. *See Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d

1358, 1366-67 (Fed. Cir. 2021) (claims indefinite because they were

"nonsensical and require an impossibility").

EcoFactor's own technical experts confirmed the problem, arriving

at different conclusions about what must be compared, and rewriting

the claim language in different ways to make sense of it. Dr. Palmer,

EcoFactor's validity expert, rewrote the limitation to require a

comparison between two rates of change. *See* Appx1686 ¶ 93. Yet Mr.

de la Iglesia, EcoFactor's infringement expert, rewrote this same limitation to require a comparison between two temperatures. *See* Appx1700-1701. This redrafting is not only improper but highlights the claim's insoluble ambiguity. *See, e.g.*, *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

Contrary to EcoFactor's assertion, Google did not merely argue in the district court about a hypothetical situation in which "an ordinary skilled artisan would not understand with reasonable certainty how to compare an inside temperature with the rate of change in inside temperatures." *See* Op. Br. at 43. Rather, Google relied upon EcoFactor's own experts' materially divergent rewriting and interpretations of the same claim language. EcoFactor's experts' divergent interpretations demonstrate that the claim language at issue fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 2014 WL 5698445, at *4 (C.D. Cal. Aug. 25, 2014) ("[I]f a person of ordinary skill would determine that there are multiple equally plausible but materially dissimilar constructions . . . the claim would

fail the 'reasonable certainty' standard").

EcoFactor even admits that the claim language is ambiguous because it "does not specify whether the comparison involves predicting individual readings from the server data or generating actual rates of change from the thermostat data." Op. Br. at 45. But EcoFactor does not explain how such ambiguous language can meet the "reasonable certainty" standard given its experts' divergent interpretations, and instead simply makes the conclusory assertion that "one of ordinary skill would understand what it means to compare recorded inside temperatures with the rate of increase predicted," tautologically pointing to language from the patent specification that likewise lacks any explanation of how one would compare a recorded temperature to an estimated rate of change, as required by the claim. Op. Br. at 43; *see* Appx68 at 7:65-8:34. The specification merely states that inside temperature is compared to "the rate of temperature rise" inside the house previously recorded on the server, with no explanation how such comparison can be performed. *See* Op. Br. at 43; *see* Appx83 at 7:65-8:34. The only other specification excerpt EcoFactor cites describes comparing "the predicted reading with the actual reading," without

mentioning comparison to a predicted rate of change. Appx83 at 7:55-60. Even if this description were enough to suggest a temperature-to-temperature comparison is encompassed by the disputed limitation, pointing to one potential example does not cure the uncertain scope of the claims.

Moreover, EcoFactor does not seem to argue that one of skill in the art would interpret the claim limitation to mean comparing a temperature to a temperature. Rather, EcoFactor suggests that one of skill in the art would know the limitation could mean **either** comparing a temperature to a temperature **or** a rate to a rate. *See* Op. Br. at 46-48; *Diamond Coating Techs., LLC*, 2014 WL 5698445, at *4. But the actual claim language contains nothing suggesting the disjunctive construction EcoFactor proposes and any attempt to introduce one now is improper.[18] *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum*

---

[18] Indeed, during reexamination, the PTO rejected EcoFactor's attempt to amend "compare an inside temperature recorded . . . with said estimation for the rate of change" to "compare an actual rate of change . . . with said estimation for the rate of change," because such amendment changes the scope of the claim language—i.e., it "no longer requires a comparison of the actual inside temperature . . . with the estimation for the rate of change." Final Office Action dated October 5, 2022, Reexam Control No. 90/014,916, at 3-5; *see also* n.17 *supra.*

*Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("improper" to "add[] an extraneous limitation appearing in the specification" into the claims).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of summary judgment of patent ineligibility; and if not, then this Court should reverse the judgment of infringement of claim 5 of the '327 patent. If any liability issues remain live, this Court should remand for a new trial on damages. It should also (1) affirm the district court's grant of JMOL of no willfulness and no inducement; (2) affirm the district court's denial of a new trial on the '382 patent; and (3) affirm the district court's grant of summary judgment of indefiniteness of the '488 patent.

Respectfully submitted,

/s/ *Robert A. Van Nest*

ROBERT A. VAN NEST
LEO L. LAM
EUGENE M. PAIGE
R. ADAM LAURIDSEN
KRISTIN E. HUCEK
KEKER, VAN NEST & PETERS
LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
Counsel for Defendant-Cross-
Appellant GOOGLE LLC

March 31, 2023

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(2)(A).  Excluding the portions exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2) the brief contains 16,209 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Century Schoolbook type.

Dated: March 31, 2023

/s/ *Robert A. Van Nest*
Robert A. Van Nest
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile:  415 397 7188